[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 416.]

CITY OF CINCINNATI, APPELLANT, *v*. BERETTA U.S.A. CORPORATION ET AL.,
APPELLEES.

[Cite as *Cincinnati v. Beretta U.S.A. Corp.*, 2002-Ohio-2480.]

*Civil procedure—Court of appeals' dismissal of complaint pursuant to Civ.R.*
*12(B)(6) against handgun manufacturers, trade associations, and*
*handgun distributor under nuisance, negligence, and product liability*
*theories of recovery reversed and remanded to trial court, when.*

(No. 2000-1705—Submitted October 2, 2001—Decided June 12, 2002.)

APPEAL from the Court of Appeals for Hamilton County, Nos. C-990729, C-
990814 and C-990815.

_____

FRANCIS E. SWEENEY, SR., J.

{¶1} On April 28, 1999, plaintiff-appellant, the city of Cincinnati, filed a
complaint against fifteen handgun manufacturers, three trade associations, and one
handgun distributor, seeking to hold them responsible under nuisance, negligence,
and product liability theories of recovery, for the harm caused by the firearms they
manufacture, sell, or distribute.[1]  The gist of the complaint is that appellees[2] have
manufactured, marketed, and distributed their firearms in ways that ensure the

---

1.  The lawsuit originally alleged other theories of liability, including fraud, negligent
misrepresentation, unfair and deceptive advertising, and unjust enrichment.  However, since
appellant does not contest the dismissal of these counts, we decline to address these issues.

2.  The named defendants are Beretta U.S.A. Corp., Bryco Arms, Inc., Colt's Manufacturing Co.,
Inc., Davis Industries, Fabbrica d'Armi Pietro Beretta Sp.A., Forjas Taurus, S.A., H & R 1871, Inc.,
B.L. Jennings, Inc., MKS Supply, Inc., Lorcin Engineering Co., Inc., North America Arms, Inc.,
Phoenix Arms, Raven Arms, Inc., Smith & Wesson Corp., Sturm & Ruger Co., Inc., Taurus
International Manufacturing, Inc., American Shooting Sports Coalition, Inc., National Shooting
Sports Foundation, Inc., and Sporting Arms and Ammunition Manufacturers Institute, Inc.  Of these
defendants, only Davis Industries, Fabbrica d'Armi Pietro Beretta Sp.A., Forjas Taurus, S.A., and
Raven Arms, Inc. did not move to dismiss.

widespread accessibility of the firearms to prohibited users, including children and criminals. Thus, the complaint asserts, due to their intentional and negligent conduct and their failure to make guns safer, appellees have fostered the criminal misuse of firearms, helped sustain the illegal firearms market in Cincinnati, and have created a public nuisance. In its complaint, appellant sought both injunctive relief and monetary damages, including reimbursement for expenses such as increased police, emergency, health, and corrections costs.

{¶2} Rather than file an answer, fifteen of the defendants ("appellees") moved to dismiss the complaint pursuant to Civ.R. 12(B)(6). The trial court granted the motions to dismiss, finding, inter alia, that (1) the complaint failed to state a cause of action, (2) the claims were barred by the doctrine of remoteness, and (3) appellant could not recoup expenditures for public services. The trial court further ruled that there was no just cause for delay, and appellant appealed. The court of appeals affirmed on similar grounds. The cause is now before this court upon the allowance of a discretionary appeal.

{¶3} This case represents one of a growing number of lawsuits brought by municipalities against gun manufacturers and their trade associations to recover damages associated with the costs of firearm violence incurred by the municipalities. There is a difference of opinion as to whether these cases state a viable cause of action. While some courts have allowed this type of case to go forward against a Civ.R. 12(B)(6) motion to dismiss (*White v. Smith & Wesson Corp.* [N.D. Ohio 2000], 97 F.Supp.2d 816; *Boston v. Smith & Wesson Corp.* [2000], 12 Mass.L.Rptr. 225, 2000 WL 1473568), other courts have dismissed or upheld the dismissal of similar lawsuits. See, e.g., *Philadelphia v. Beretta U.S.A. Corp.* (E.D.Pa.2000), 126 F.Supp.2d 882; *Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.* (C.A.3, 2001), 273 F.3d 536; *Ganim v. Smith & Wesson Corp.* (2001), 258 Conn. 313, 780 A.2d 98. After a thorough review of these cases, we agree with those decisions that permit this type of lawsuit to go beyond the

pleadings stage. For the reasons that follow, we reverse the judgment of the court of appeals and remand the cause to the trial court.

## I. Sufficiency of Complaint

{¶4} The trial court granted appellees' Civ.R. 12(B)(6) motions to dismiss and the court of appeals affirmed. In determining whether the motions were properly granted, we must decide whether the complaint states a cause of action under Ohio law.

{¶5} The standard for determining whether to grant a Civ.R. 12(B)(6) motion is straightforward. In order for a complaint to be dismissed under Civ.R. 12(B)(6) for failure to state a claim, it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to relief. *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus. Furthermore, "[i]n construing a complaint upon a motion to dismiss for failure to state a claim, we must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party." *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753. We reiterated this view in *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 144, 573 N.E.2d 1063, and further noted that "as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss." Id. at 145, 573 N.E.2d 1063.

{¶6} In addressing the sufficiency of the complaint, we will examine each claim separately. In particular, appellant maintains that it has stated viable causes of action for public nuisance, negligence, and product liability.

## A. Public Nuisance

{¶7} Appellant alleged in its complaint that appellees have created and maintained a public nuisance by manufacturing, marketing, distributing, and selling firearms in ways that unreasonably interfere with the public health, welfare, and

safety in Cincinnati and that the residents of Cincinnati have a common right to be free from such conduct. Appellant further alleged that appellees know, or reasonably should know, that their conduct will cause handguns to be used and possessed illegally and that such conduct produces an ongoing nuisance that has a detrimental effect upon the public health, safety, and welfare of the residents of Cincinnati.

{¶8} Appellees advance several reasons why the complaint does not state a cause of action for public nuisance. First, appellees maintain that Ohio's nuisance law does not encompass injuries caused by product design and construction, but instead is limited to actions involving real property or to statutory or regulatory violations involving public health or safety. We disagree. The definition of "public nuisance" in 4 Restatement of the Law 2d, Torts (1965) ("Restatement") is couched in broad language. According to the Restatement, a "public nuisance" is "an unreasonable interference with a right common to the general public." 4 Restatement, Section 821B(1). "Unreasonable interference" includes those acts that significantly interfere with public health, safety, peace, comfort, or convenience, conduct that is contrary to a statute, ordinance, or regulation, or conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware. Id., Section 821B(2). Contrary to appellees' position, there need not be injury to real property in order for there to be a public nuisance. As stated in Comment *h* to Section 821B, "[u]nlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land." Id. at 93.

{¶9} Moreover, although we have often applied public nuisance law to actions connected to real property or to statutory or regulatory violations involving

public health or safety,[3] we have never held that public nuisance law is strictly limited to these types of actions. The court of appeals relied on our decision in *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 632 N.E.2d 502, to support its view that allegedly defective product designs are not nuisances. However, the *Franks* decision was strictly limited to the question of whether the allegedly defective design and construction of a roadway intersection and the failure to erect signage or guardrails constituted a nuisance in the context of sovereign immunity. It does not involve the broader question that we are presented with here.

{¶10} Nor should *Franks* be interpreted to mean that public-nuisance law cannot cover injuries caused by product design and construction. Instead, we find that under the Restatement's broad definition, a public-nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public.

{¶11} Even the Supreme Court of Connecticut, in *Ganim v. Smith & Wesson Corp.,* 258 Conn. at 369-370, 780 A.2d 98, while dismissing the lawsuit for lack of standing, acknowledged that the definition of a common-law public nuisance was broad enough to include allegations nearly identical to those in appellant's complaint. Likewise, in his concurring opinion below, Judge Hildebrandt, in the belief that public nuisance law did not apply to product liability cases, urged this court to revisit the issue, since, in his view "the city should be permitted to bring suit against the manufacturer of a product under a public-nuisance theory, when, as here, the product has allegedly resulted in widespread harm and widespread costs to the city as a whole and to its citizens individually." See, also, *Young v. Bryco Arms* (2001), 327 Ill.App.3d 948, 262 Ill.Dec. 175, 765 N.E.2d 1, where the First

---

3. See, e.g., *Mansfield v. Balliett* (1902), 65 Ohio St. 451, 467, 63 N.E. 86 (pollution of stream on plaintiff's property due to defendant municipality's discharge of sewage downstream constitutes a nuisance).

District Appellate Court of Illinois held that the plaintiffs, surviving relatives of five gunshot victims, sufficiently pled a public nuisance claim against various gun manufacturers, wholesale distributors, and retail gun dealers, finding that the misconduct alleged (that the defendants' marketing and distribution practices allowed an underground firearms market to flourish) fell within the ambit of the Restatement's broad definition of public nuisance.

{¶12} Appellees further argue that they cannot be held liable for the harm alleged because they did not have control over the alleged nuisance at the time of injury. Contrary to appellees' position, it is not fatal to appellant's public nuisance claim that appellees did not control the actual firearms at the moment that harm occurred.

{¶13} Appellant's complaint alleged that appellees created a nuisance through their ongoing conduct of marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal market. Thus, appellant alleged that appellees control the creation and supply of this illegal, secondary market for firearms, not the actual use of the firearms that cause injury. See *Boston v. Smith & Wesson,* 12 Mass.L.Rptr. 225, 2000 WL 1473568, at * 14. Just as the individuals who fire the guns are held accountable for the injuries sustained, appellees can be held liable for creating the alleged nuisance.

{¶14} Appellees also contend that appellant's nuisance claim cannot go forward because the distribution of firearms is highly regulated and covers "legislatively authorized conduct." As a result, appellees believe that the nuisance claim was properly dismissed because "[w]hat the law sanctions cannot be held to be a public nuisance." *Mingo Junction v. Sheline* (1935), 130 Ohio St. 34, 3 O.O. 78, 196 N.E. 897, paragraph three of the syllabus. Even though there exists a comprehensive regulatory scheme involving the manufacturing, sales, and distribution of firearms, see, e.g., Section 922, Title 18, U.S.Code; Part 178, Title

27, C.F.R., the law does not regulate the distribution practices alleged in the complaint.

{¶15} Finally, appellees argue that the public nuisance claim fails because appellant has failed to plead an underlying tort to support either an absolute public nuisance claim based on intentional or ultrahazardous activity or a negligence-based claim of qualified public nuisance.[4]  However, the complaint clearly alleged both intentional and negligent misconduct on appellees' part.  For example, Paragraph 119 of the complaint alleged that defendants "intentionally and recklessly market, distribute and sell handguns that defendants know, or reasonably should know, will be obtained by persons with criminal purposes     * * *."

{¶16} Therefore, under these circumstances, we find that appellant has adequately pled its public-nuisance claim and has set forth sufficient facts necessary to overcome appellees' motion to dismiss.

### B. Negligence

{¶17} Appellant further alleged in its complaint that appellees were negligent in failing to exercise reasonable care in designing, manufacturing, marketing, advertising, promoting, distributing, supplying, and selling their firearms without ensuring that the firearms were safe for their intended and foreseeable use by consumers.  In addition, the complaint alleged that appellees failed to exercise reasonable care to provide a full warning to consumers of the risks associated with firearms.

---

4. A nuisance can be further classified as an absolute nuisance (nuisance per se) or as a qualified nuisance.  *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 28 O.O. 369, 55 N.E.2d 724, paragraphs two and three of the syllabus.  With an absolute nuisance, the wrongful act is either intentional or unlawful and strict liability attaches notwithstanding the absence of fault because of the hazards involved (*Metzger v. Pennsylvania, Ohio & Detroit RR. Co.* [1946], 146 Ohio St. 406, 32 O.O. 450, 66 N.E.2d 203, paragraph one of the syllabus), whereas a qualified nuisance involves a lawful act "so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another."  Id. at paragraph two of the syllabus.  A qualified nuisance hinges upon proof of negligence.  Id.

**{¶18}** In order to maintain a negligence action, the plaintiff must show the existence of a duty, a breach of that duty, and that the breach of that duty proximately caused the plaintiff's injury. *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 142, 539 N.E.2d 614. The court of appeals in the instant case upheld the dismissal of the negligence claims on the ground that the city could not establish that the defendants owed it any duty. In reaching this conclusion, the court cited *Gelbman v. Second Natl. Bank of Warren* (1984), 9 Ohio St.3d 77, 9 OBR 280, 458 N.E.2d 1262, and *Simpson v. Big Bear Stores Co.* (1995), 73 Ohio St.3d 130, 652 N.E.2d 702, for the proposition that a duty to control the conduct of a third party arises only if a "special relationship" exists between the parties. See, also, 2 Restatement, Section 315. Since there was no special relationship, the court of appeals concluded that the defendants owed no duty to appellant.

**{¶19}** The court of appeals misconstrued the nature of appellant's negligence claims and erred in relying on the above authorities to dismiss those claims for lack of duty. In both *Gelbman* and *Simpson,* the issue before this court was whether, based on their status as property owners, the defendants owed a duty to protect persons such as business invitees from the negligence or criminal acts of third parties that occur outside the owner's property and beyond the owner's control. In contrast, the negligence issue before us is not whether appellees owe appellant a duty to control the conduct of third parties. Instead, the issue is whether appellees are themselves negligent by manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in foreseeable injury. Consequently, the "special relationship" rule is not determinative of the issue presented here. Instead, the allegations of the complaint are to be addressed without resort to that rule.

**{¶20}** The court in *Boston v. Smith & Wesson,* 12 Mass.L.Rptr. 225, 2000 WL 1473568, understood this distinction. When the gun defendants made a similar argument, that the city's negligent marketing and distribution claims failed because

the defendants did not owe the city any duty to protect it from the criminal acts of third parties, the court stated:

{¶21} "Plaintiffs do not allege that Defendants were negligent for failure to protect from harm but that Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiffs.  * * *

{¶22} "Taking Plaintiffs' allegations as true, Defendants have engaged in affirmative acts (i.e., creating an illegal, secondary firearms market) by failing to exercise adequate control over the distribution of their firearms.  Thus, it is affirmative conduct that is alleged—the creation of the illegal, secondary firearms market.  The method by which Defendants created this market, it is alleged, is by designing or selling firearms without regard to the likelihood the firearms would be placed in the hands of juveniles, felons or others not permitted to use firearms in Boston.  * * *  Taken as true, these facts suffice to allege that Defendants' conduct unreasonably exposed Plaintiffs to a risk of harm.  Worded differently, the Plaintiffs were, from Defendants' perspective, foreseeable plaintiffs.  Thus, the court need not decide whether Defendants owed a duty greater than the basic duty." (Footnotes omitted.)  12 Mass.L.Rptr. 225, 2000 WL 1473568, at * 15.

{¶23} The court in *White v. Smith & Wesson,* 97 F.Supp.2d 816, also applied straight negligence principles.  In allowing plaintiffs' negligence claims to survive a Civ.R. 12(B)(6) motion to dismiss, the court noted,  "It cannot be said, as a matter of law, that Defendants are free from negligence because they do not owe Plaintiffs a duty of care.  It is now, unfortunately, the common American experience that firearms in the hands of children or other unauthorized users can create grave injury to themselves and others, thus creating harm to municipalities through physical and economic injury.  It is often for a jury to decide whether a plaintiff falls within the range of a defendant's duty of care and whether that duty was fulfilled.  * * *  In this matter, the question is whether a reasonably prudent gun manufacturer should have anticipated an injury to the Plaintiffs as a probable result

of manufacturing, marketing, and distributing a product with an alleged negligent design."

**{¶24}** The court in *James v. Arcadia Machine & Tool* (Dec. 11, 2001), N.J.Super. No. ESX-L-6-59-99, also recognized the importance of allowing the plaintiffs to advance their negligence claims against the gun defendants. The court reasoned, "With no more than paper allegations and a complete absence of discovery, it would be manifestly unfair to bar the Plaintiff[s] [Newark and its mayor] from attempting to present appropriate evidence to bridge the gap between breach of duty and damages." Id. at 26-27.

**{¶25}** We agree with the rationale employed by these courts and similarly conclude that appellant has alleged a cause of action in negligence. Therefore, we find that the court of appeals erred in upholding the dismissal of the negligence counts.

## C. Product Liability

**{¶26}** Appellant also seeks recovery under two products liability theories, for defective design and failure to warn. In its complaint, appellant alleged that the guns manufactured or supplied by appellees were defective because they do not incorporate feasible safety devices that would prevent unauthorized use and foreseeable injuries. As to the cause of action for failure to warn, appellant alleged that appellees manufactured or supplied guns without adequate warning of their dangerousness or instruction as to their use.

**{¶27}** The court of appeals upheld the dismissal of these claims, finding that the complaint was deficient because it did not allege with specificity "a single defective condition in a particular model of gun at the time it left its particular manufacturer." Furthermore, the court held that the city could not bring its claims under the Product Liability Act, R.C. 2307.71 et seq., because it could prove no harm to itself. Nor could it recover economic loss alone under the Act, citing R.C. 2307.71(B) and (G), 2307.79, and *LaPuma v. Collinwood Concrete* (1996), 75

Ohio St.3d 64, 661 N.E.2d 714, syllabus. In his concurring opinion, Judge Painter stated his belief that had the claims not been barred by remoteness, the product liability claims remained viable causes of action under the common law. Judge Painter also said that he disagreed "with the majority's conclusion that the city's products-liability claims fail because the city's complaint did not allege particular guns or defective conditions that caused direct injuries.

{¶28} "Notice pleading is still the law, and the city clearly alleged that each defendant has manufactured defective products by failing to implement alternative safety designs. That was enough to give the manufacturers fair notice of the claims against them."

{¶29} We agree with the reasoning of Judge Painter's concurring opinion. Contrary to the appellate court's majority opinion, since Ohio is a notice-pleading state, Ohio law does not ordinarily require a plaintiff to plead operative facts with particularity.[5] Under the Ohio Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the party is entitled to relief." Civ.R. 8(A)(1). Consequently, "as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss." *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 145, 573 N.E.2d 1063. Appellant's complaint withstands this test of notice pleading, since it alleged that appellees had manufactured or supplied defective guns without appropriate safety features. See *White,* 97 F.Supp.2d at 827. Appellant was not required to allege with specificity that particular guns were defective and as a result caused particular injuries.

---

5. In *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 573 N.E.2d 1063, we stated that only in a few circumscribed types of cases, such as a workplace intentional tort or a negligent-hiring claim against a religious institution, do we require that the plaintiff plead operative facts with particularity. Id. at 145, 573 N.E.2d at 1065.

**{¶30}** Nevertheless, appellant is precluded from bringing its statutory product liability claims. Under the Product Liability Act, a claimant (including a governmental entity) cannot recover economic damages alone. Instead, in order to fall within the purview of the Act, and to be considered a "product liability claim" under R.C. 2307.71(M), the complaint must allege damages other than economic ones. *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 661 N.E.2d 714, syllabus.[6] In this case, since appellant alleged only economic damages, it has not set forth a statutory product liability claim and is consequently barred from bringing any such claims under the Act.

**{¶31}** However, the failure to allege other than economic damages does not necessarily destroy the right to pursue common-law product liability claims. Id. at syllabus. In *Carrel v. Allied Prods. Corp.* (1997), 78 Ohio St.3d 284, 677 N.E.2d 795, paragraph one of the syllabus, we held, "The common-law action of negligent design survives the enactment of the Ohio Products Liability Act, R.C. 2307.71 *et seq.*" Therefore, although appellant is precluded from asserting its claims under Ohio's Product Liability Act, it can still assert its common-law negligent design claims. At common law, a product is defective in design "if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design." *Knitz v. Minster Machine Co.* (1982), 69 Ohio St.2d 460, 23 O.O.3d 403, 432 N.E.2d 814, syllabus. Moreover, a product may be defective in design if the manufacturer fails to incorporate feasible safety features to prevent foreseeable injuries. *Perkins v. Wilkinson Sword, Inc.* (1998), 83 Ohio

---

6. A claimant can recover economic losses only after first establishing that it can recover compensatory damages for harm from a manufacturer or supplier. R.C. 2307.79. "Harm" is defined as "death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not 'harm.' " R.C. 2307.71(G). Since appellant did not allege that it suffered harm within the meaning of the Act, it cannot recover for economic loss under R.C. 2307.79.

St.3d 507, 511, 700 N.E.2d 1247. Appellant has set forth a common-law defective design claim by alleging that appellees have failed to design their firearms with feasible safety features.[7]

{¶32} We likewise find that appellant can bring a common-law failure-to-warn claim. Under the rationale espoused in *Carrel v. Allied Prods. Corp., supra*, the statute does not clearly state that it intended R.C. 2307.76, the failure-to-warn statute, to supersede the common-law action. Id., 78 Ohio St.3d at 288, 677 N.E.2d 795. Thus, the common-law failure-to-warn claim survives the enactment of Ohio's Product Liability Act, R.C. 2307.71 et seq.

{¶33} To recover under a failure-to-warn theory at common law, the plaintiff must prove that the manufacturer knew or should have known, in the exercise of reasonable care, of the risk or hazard about which it failed to warn and that the manufacturer failed to take precautions that a reasonable person would take in presenting the product to the public. *Crislip v. TCH Liquidating Co.* (1990), 52 Ohio St.3d 251, 257, 556 N.E.2d 1177.

{¶34} The court of appeals reasoned that the failure-to-warn claim could not go forward because the defendants owe no duty to warn of the dangers associated with firearms, which are open and obvious dangers. Although, in general, the dangers associated with firearms are open and obvious, appellant has alleged sufficient facts in its complaint to overcome a motion to dismiss. As pointed out by Judge Painter's concurrence, some of the allegations involve risks that are not open and obvious, such as the fact that a semiautomatic gun can hold a

---

7. According to appellant, the feasible safety features include internal locking devices to "personalize" guns to prevent unauthorized users from firing them, chamber-loaded indicators to indicate that a round is in the chamber, and magazine-disconnect safeties that prevent guns from firing when the magazine is removed. On March 17, 2000, Smith & Wesson announced a settlement agreement with various cities, state attorneys general, and the Department of Housing and Urban Development in which it agreed to change its distribution practices and implement certain safety devices. See Dao, Under Legal Siege, Gun Maker Agrees to Accept Curbs, New York Times (Mar. 18, 2000), at A1.

bullet even when the ammunition magazine is empty or removed. Therefore, since appellant properly alleges failure to warn, this claim withstands a motion to dismiss. See, also, *White v. Smith & Wesson,* 97 F.Supp.2d at 827-828, where the court refused to hold as a matter of law that the use of handguns involved an "open and obvious risk."

## II. Remoteness

{¶35} Appellees maintain that even if appellant could establish any of the elements of the individual torts it alleged, the injuries to the city are still too remote to create liability on the part of the gun manufacturers and trade associations. In essence, appellees argue that remoteness bars recovery, since the causal connection between the alleged wrongdoing and the alleged harm is too tenuous and remote and because the claims asserted are indirect and wholly derivative of the claims of others.

{¶36} Remoteness is not an independent legal doctrine but is instead related to the issues of proximate causation or standing. *White,* 97 F.Supp.2d at 823; *Boston v. Smith & Wesson Corp.*, 12 Mass.L.Rptr. 225, 2000 WL 1473568, at * 4, fn. 20. Thus, a complaint will fail on remoteness grounds if the harm alleged is the remote consequence of the defendant's misconduct (causation) or is wholly derivative of the harm suffered by a third party (standing).

{¶37} In *Holmes v. Securities Investor Protection Corp.* (1992), 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532, the United States Supreme Court discussed remoteness and stated that, at least in some cases at common law, there must be "some direct relation between the injury asserted and the injurious conduct alleged." Id. at 268, 112 S.Ct. 1311, 117 L.Ed.2d 532. Thus, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." Id. at 268-269, 112 S.Ct. 1311, 117 L.Ed.2d 532, citing 1 Sutherland, Law of Damages (1882) 55-56. In *Holmes*, the court explained why directness of

relationship is a requirement of causation: (1) indirectness adds to the difficulty in determining which of the plaintiff's damages can be attributed to the defendant's misconduct, (2) recognizing the claims of the indirectly injured would complicate the apportionment of damages among plaintiffs to avoid multiple recoveries, and (3) these complications are unwarranted given the availability of other parties who are directly injured and who can remedy the harm without these associated problems. Id. at 269-270, 112 S.Ct. 1311, 117 L.Ed.2d 532.

{¶38} In applying these factors to handgun litigation, the courts have taken divergent positions. While some courts have found that remoteness bars recovery (see, e.g., *Ganim v. Smith & Wesson Corp.,* 258 Conn. 313, 780 A.2d 98, using the "standing" aspect of remoteness), the courts in *White v. Smith & Wesson*, 97 F.Supp.2d 816, and in *Boston v. Smith & Wesson*, 12 Mass.L.Rptr. 225, 2000 WL 1473568, have rejected the remoteness argument. In *White*, for instance, the court concluded that remoteness did not deprive the city and the mayor of standing to sue the gun manufacturers and trade associations, since the plaintiffs were "asserting their own rights and interests and, while their claims would impact the health and safety of others, their claims are not based on the rights of others, but rather the rights of the City to sue for the harm and economic losses it has incurred, as well as their claims of unjust enrichment and nuisance abatement." Id. at 825.

{¶39} Similarly, in *Boston v. Smith & Wesson Corp.*, although the court acknowledged that some of the injuries alleged appear to arise from harm to others, it stated that "this alleged harm is in large part not 'wholly derivative of' or 'purely contingent on' harm to third parties. [H]arm to Plaintiffs may exist even if no third party is harmed. * * * Even if no individual is harmed, Plaintiffs sustain many of the damages they allege due to the alleged conduct of Defendants fueling an illicit market (e.g., costs for law enforcement, increased security, prison expenses and youth intervention services). Similarly, diminished tax revenues and lower property values may harm Plaintiffs separately from any harm inflicted on

individuals. * * * Indeed, much of the harm alleged is of a type that can only be suffered by these plaintiffs." (Footnote omitted.) 12 Mass.L.Rptr. 225, 2000 WL 1473568, at * 6.

{¶40} We agree with the reasoning espoused in *White* and *Boston*. The complaint in this case alleged that as a direct result of the misconduct of appellees, appellant has suffered "actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services."

{¶41} Under the Civ.R. 12(B)(6) standard, we must presume that all factual allegations are true. See *Warth v. Seldin* (1975), 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343, where the United States Supreme Court held that when standing is challenged on a motion to dismiss, the allegations must be construed as if true. Therefore, in taking the allegations in the complaint as true, we find that the alleged harms are direct injuries to appellant, and that such harms are not so remote or indirect as to preclude recovery by appellant as a matter of law.

{¶42} With regard to whether causation is too remote in this case, we turn to the three factors outlined in *Holmes*, 503 U.S. at 269-270, 112 S.Ct. 1311, 117 L.Ed.2d 532. The first concern, difficulty of proof, is minimal in this case, since appellant is seeking recovery, in part, for police expenditures and property repairs, which can be easily computed. Under the second factor, there is little risk of double recovery, since appellant is seeking recovery for injuries to itself only. Finally, no other person is available to bring suit against appellees for these damages. Under the third factor, *Holmes* asks whether "the general interest in deterring injurious conduct" will be better served by requiring that suit be brought by more directly injured victims. Id., 503 U.S. at 269, 112 S.Ct. 1311, 117 L.Ed.2d 532. Although appellant is indirectly attempting to protect its citizens from the alleged misconduct by the gun manufacturers and trade associations, appellant is seeking recovery for its own harm. Under these circumstances, the general interest will be best served

by having this plaintiff bring this lawsuit. We believe that appellant can withstand scrutiny under the *Holmes* test. Consequently, we find that the court of appeals erred in concluding that appellant's claims were too remote for recovery.

### III. Recoupment of Cost of Governmental Services

{¶43} Appellant alleged in its complaint that due to the misconduct of appellees, it has sustained damages, including "significant expenses for police, emergency, health, corrections, prosecution and other services." Appellees contend that the cost of these public services is nonrecoverable, since these are services the city is under a duty to provide.

{¶44} For support, appellees rely in part on *Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.* (C.A.9, 1983), 719 F.2d 322, a case in which the city sought to recoup police, fire, and other expenses associated with protecting the public from a petroleum gas spill arising from a train derailment. In that case, the court stated that "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service. Where such services are provided by the government and the costs are spread by taxes, the tortfeasor does not expect a demand for reimbursement." (Citation omitted.) Id. at 323. The court of appeals accepted this position and held that a municipality may not recover for expenditures for ordinary public services that it has the duty to provide.

{¶45} Although a municipality cannot reasonably expect to recover the costs of city services whenever a tortfeasor causes harm to the public, it should be allowed to argue that it may recover such damages in this type of case. Unlike the train derailment that occurred in the *Flagstaff* case, which was a single, discrete incident requiring a single emergency response, the misconduct alleged in this case is ongoing and persistent. The continuing nature of the misconduct may justify the recoupment of such governmental costs. Therefore, if appellant can prove all the elements of the alleged torts, it should be able to recover the damages flowing from

appellees' misconduct. Moreover, even the *Flagstaff* court recognized that recovery by a governmental entity is allowed "where the acts of a private party create a public nuisance which the government seeks to abate." *Flagstaff*, 719 F.2d at 324. We therefore reject the court of appeals' holding that appellant cannot recover its governmental costs.

IV. Constitutional Arguments

**{¶46}** Appellees further argue that appellant is attempting to regulate a national firearms industry and, therefore, its claims are barred under the Commerce Clause and the Due Process Clause of the United States Constitution.

**{¶47}** The Commerce Clause " 'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.' " *Healy v. Beer Inst.* (1989), 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275, quoting *Edgar v. MITE Corp.* (1982), 457 U.S. 624, 642-643, 102 S.Ct. 2629, 73 L.Ed.2d 269. Despite the fact that no statute or regulation is involved in this case, appellees maintain that this litigation violates the Commerce Clause because appellant is seeking extraterritorial jurisdiction over conduct occurring outside Cincinnati's city limits. For support, appellees rely on *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, which found that Alabama's imposition of economic sanctions on BMW violated the Commerce Clause.

**{¶48}** Appellees' reliance on the *BMW* decision is misplaced. In finding a Commerce Clause violation in *BMW*, the court reasoned that Alabama could not impose punitive damages on BMW where the alleged misconduct (repainting a new car without notifying the dealer or purchaser) arose outside Alabama and did not affect Alabama residents. The court's rationale was that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." Id. at 572, 116 S.Ct. 1589, 134 L.Ed.2d 809. Thus, Alabama could not "punish BMW for conduct that was lawful where it

occurred and that had no impact on its residents." Id. at 573, 116 S.Ct. 1589, 134 L.Ed.2d 809.

{¶49} Appellant's complaint seeks injunctive relief to enjoin appellees from continuing to engage in what appellant considers to be the unlawful manufacture, marketing, and distribution of unsafe handguns. Although the injunctive relief sought may affect out-of-state conduct, we reject appellees' argument that such relief would violate the Commerce Clause. Unlike the *BMW* case, which involved an excessive punitive damages award intended to change a tortfeasor's lawful conduct in states outside Alabama, in this case, the alleged harm, which may or may not call for punitive damages, directly affects the residents of Cincinnati. Thus, the fact that appellant's claims implicate the national firearms trade does not mean that the requested relief would violate the Commerce Clause. See *White v. Smith & Wesson,* 97 F.Supp.2d at 830, which likewise found no Commerce Clause violation.

{¶50} We find no impediment in the Due Process or Commerce Clause that requires dismissal of this lawsuit.

V. Conclusion

{¶51} In conclusion, we find that the court of appeals erred in upholding the dismissal of the complaint, since sufficient facts have been alleged to withstand scrutiny under Civ.R. 12(B)(6). Reversal of the judgment, however, does not mean that appellant will prevail upon remand. What it does mean is that appellant has alleged the facts necessary to withstand a motion to dismiss and will now have the opportunity to pursue its claims. While we do not predict the outcome of this case, we would be remiss if we did not recognize the importance of allowing this type of litigation to go past the pleading stages. As two commentators so aptly noted: "If as a result of both private and municipal lawsuits, firearms are designed to be safer and new marketing practices make it more difficult for criminals to obtain guns, some firearm-related deaths and injuries may be prevented. While no one should

believe that lawsuits against gun manufacturers and dealers will solve the multifaceted problem of firearm violence, such litigation may have an important role to play, complementing other interventions available to cities and states." Vernick & Teret, New Courtroom Strategies Regarding Firearms: Tort Litigation Against Firearm Manufacturers and Constitutional Challenges to Gun Laws (1999), 36 Hous.L.Rev. 1713, 1754.

{¶52} Accordingly, for the above reasons, we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings consistent with this decision.

Judgment reversed

and cause remanded.

DOUGLAS, RESNICK and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

––––––––––––––––

**MOYER, C.J.**, **dissenting**.

{¶53} I respectfully dissent from the majority's decision. Appellant alleges an "epidemic of handguns in the hands of persons who cannot lawfully possess them, which has brought terror to the streets, schoolyards, playgrounds, and homes of Cincinnati and has resulted in thousands of preventable shootings of innocent citizens, especially children and police officers." These are serious allegations, and portray a city under siege virtually overrun with criminals bearing illegally obtained handguns.

{¶54} However, the issue before us is not whether the city could prove that appellees fail to take reasonable measures that would prevent handguns they sell from being possessed by criminals and minors. Nor is the issue whether this alleged failure "unreasonably interferes with the public's health, safety, welfare, and peace," as alleged by appellant. The issue is not whether we agree with appellant

that there exists in Cincinnati an epidemic of violence due to handguns illegally obtained.

{¶55} This appeal simply involves a question of law: does the city have standing to assert its claims? The majority holds that appellant has standing. I disagree with this conclusion, and would find the city's alleged injuries to be too remote from the conduct of appellees and too derivative of the harms suffered by victims of handgun violence to establish proper standing to sue the appellees.

{¶56} As the majority's discussion regarding remoteness and proximate causation aptly demonstrates, the harm alleged by the city must not be a remote or tenuous consequence of the appellees' alleged misconduct. Although " '[in] a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events,' " courts have limited an actor's responsibility for the consequences of the actor's conduct. *Johnson v. Univ. Hosps. of Cleveland* (1989), 44 Ohio St.3d 49, 57, 540 N.E.2d 1370 (quoting Prosser & Keeton, Law of Torts [5th Ed.1984] 264, Section 41). The limitation of proximate causation rests in a very large part on the nature and degree of the connection between the defendant's acts and the events of which the plaintiff complains. Id.

The *Holmes* test

{¶57} I agree with the majority that the Supreme Court in *Holmes v. Securities Investor Protection Corp.* (1992), 503 U.S. 258, 269, 112 S.Ct. 1311, 117 L.Ed.2d 532, articulated the reason directness of relationship is a central requirement of causation. "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. * * * Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the

risk of multiple recoveries. * * * And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."

{¶58} The factors in *Holmes* are determinative of whether a plaintiff's claims are too remote or derivative. However, I strongly disagree with the majority's analysis and application of the test to the instant case.

{¶59} The majority's opinion provides helpful analysis of the two prevailing views reflected in the numerous civil actions by municipalities asserting negligence and public nuisance by gun manufacturers. I find the view represented in *Ganim v. Smith & Wesson* to be persuasive. *Ganim v. Smith & Wesson Corp.* (2001), 258 Conn. 313, 780 A.2d 98. *Ganim* was the first of these cases to be decided by a state supreme court. Affirming the trial court's dismissal for lack of standing, the Supreme Court of Connecticut held that the city of Bridgeport lacked standing because the harms it alleged were too remote, indirect, and derivative with respect to the defendants' alleged conduct. Id. at 365, 780 A.2d 98. The court noted that questions of remoteness and indirectness in the context of standing are analogous to questions of proximate cause in federal standing jurisprudence, which "reflects 'ideas of what justice demands, or of what is administratively possible and convenient.' " Id. at 349-350, 780 A.2d 98, quoting Prosser & Keeton, Torts (5th Ed.1984) 264, Section 41.

A. Alleged injuries of the city are indirect, as they are too remote from the manufacturers' conduct and too derivative of others' harms

{¶60} In determining that the plaintiffs could not satisfy the first *Holmes* factor, that of directness, the *Ganim* court emphasized the numerous "links in the factual chain between the defendants' conduct and the harms suffered by the plaintiffs." Id. at 353, 780 A.2d 98. Specifically, the court noted that manufacturers

sell handguns to distributors or wholesalers, and that these sales are lawful because federal law requires both buyers and sellers to be licensed. Id. at 353-354, 780 A.2d 98. Distributors then sell the handguns to retailers. Id. These sales are also lawful in that federal law requires both the distributors and the retailers to be licensed. Id. Next, retailers sell the guns legally either to authorized buyers, i.e., legitimate consumers, or to unauthorized buyers through the "straw man" method or other illegitimate means. Id. at 354, 780 A.2d 98. These latter sales would probably be criminal under federal law. Id. Next, the illegally acquired guns enter a black market, eventually finding their way to unauthorized users. Id.

{¶61} At this point, either authorized buyers misuse the handguns by not taking proper storage or other unwarned or uninstructed precautions, or unauthorized buyers misuse the guns to commit crimes or other harmful acts. Id. The city then incurs expenses for various municipal necessities, including crime investigation, emergency and other medical services for the injured, or similar expenses. Id. Finally, the city may suffer financial consequences, including increased costs for municipal services, increased tax burdens on taxpayers, reduced property values, loss of investments and economic development, loss of tax revenues from lost productivity, injuries and deaths of the city's residents, destruction of families and communities in the city, and the negative impact on the lifestyle of the city's children and ability of its residents to live free from apprehension of danger. Id. at 354-355, 780 A.2d 98.

{¶62} The *Ganim* court found that the number of links in this factual chain was in and of itself strongly suggestive of remoteness. Id. at 355, 780 A.2d 98 citing *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc*. (C.A.3, 1999), 171 F.3d 912, 930. *Steamfitters Local* focused on the "sheer number of links in the chain of causation" between the tobacco company's suppression of information and the increased costs of health care by the union fund, concluding that the "extremely indirect nature of the Fund's injuries and the highly speculative

and complex damages claims" demonstrated that the union's claims "are precisely the type of indirect claims that the proximate cause requirement is intended to weed out." Id. at 930.

{¶63} I agree with this reasoning, and would find that the first factor articulated in *Holmes* militates against granting the city standing for these claims. In the instant case, the city characterizes appellees as corporations that design, manufacture, advertise, import and/or sell firearms that can be fired by unauthorized or unintended users in Cincinnati. Therefore, the links in the factual chain between appellees' conduct and harms suffered by the city are similar to those links enumerated in *Ganim*: manufacturer to distributor or wholesaler, distributor or wholesaler to retailer, retailer to authorized or unauthorized buyers, and ultimately accidental misuse by authorized buyers or criminal misuse by unauthorized buyers. Accidental and criminal misuse of handguns then results in increased expenses for the city for "additional police protection, overtime, emergency services, pension benefits, health care, social services and other necessary facilities and services." In addition, the city alleges that it has sustained "a loss of investment, economic development and tax revenue due to lost productivity—all associated with the defective design, and negligent manufacture, assembly, marketing, distribution, promotion and sale of guns."

{¶64} *Holmes* held that indirectness adds to the difficulty in determining which of a plaintiff's damages are attributable to a defendant's misconduct. *Holmes*, 503 U.S. at 269-270, 112 S.Ct. 1311, 117 L.Ed.2d 532. The very fact that there are multiple links between the conduct of the manufacturers and the harms suffered by the city demonstrates the difficulty in determining damages. For example, where a criminal wrongdoer harms another with an illegally obtained handgun, that criminal offender is responsible for injuries caused to the victim. Depending upon how the wrongdoer obtained the handgun, there may be a number of persons linking the offender to the retailer or distributor, who may also be liable.

Additionally, there will be enormous difficulties in determining exactly how much of municipal expenses such as police, emergency services, pension benefits, health care, social services and other necessary facilities and services, as well as loss of revenue and investment and economic development, are a result of *only* the manufacturers' actions and *not the actions of the criminal wrongdoer, the retailer, distributor, or persons who possess guns legally*.

**{¶65}** Finally, factors other than the manufacture, advertisement, distribution, and retail sales of handguns may contribute to the various harms claimed by the plaintiffs. *Ganim*, 258 Conn. at 356, 780 A.2d 98. According to *Ganim*, these may include "illegal drugs, poverty, illiteracy, inadequacies in the public educational system, the birth rates of unmarried teenagers, the disintegration of family relationships, the decades long trend of the middle class moving from city to suburb, * * * the upward track of health costs generally, * * * and unemployment." Id.

**{¶66}** *Ganim* held that in addition to remoteness, the harms suffered by the plaintiffs were derivative of those suffered by the victims and their families. Id. at 355, 780 A.2d 98. In other words, the city would not suffer the harm of increased costs for municipal services but for the fact that certain residents of the city had been the primary victims of handgun violence. Id. For example, increased medical costs are essentially costs imposed on the victims of handgun violence, and decreased tax revenues from lost productivity are a result of lost productivity and income on the part of otherwise productive residents who have fallen victim to handgun violence. Id.

**{¶67}** I agree with this reasoning. The majority characterizes this first factor as one of "difficulty of proof," and believes the difficulty to be minimal, as the city "is seeking recovery, in part, for police expenditures and property repairs, which can be easily computed." However, in order to prove damages, the city must first identify which incidents involved the use of illegal handguns or legal handguns

in the hands of unauthorized users, and then link that portion of the city's costs to that incident. In many instances the weapon used in a crime is never recovered. How, under these circumstances, can the city prove that the weapon involved was either illegal or in the hands of an unauthorized user?

{¶68} In addition to disagreeing with the majority's determination that the expenses borne by the city are easily capable of proof, I strongly disagree with the majority's characterization of the first *Holmes* factor as one of difficulty of proof.

{¶69} The question is not whether the city can prove that it has suffered damages, but whether the city can prove that those damages are attributable to the wrongdoing of the gun manufacturers as opposed to other, independent factors. *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311, 117 L.Ed.2d 532. Given the multiple links in the factual chain between the gun manufacturers' conduct and harms suffered by the city, the derivative nature of the harms when viewed in conjunction with harms suffered by the primary victims of handgun violence, as well as the multiple societal factors that contribute to the misuse of handguns, I would find a very high degree of difficulty in determining the amount of the city's damages attributable to the conduct of the gun manufacturers.

B. Recognizing the city's claim would require a court to adopt complicated rules apportioning damages

{¶70} The majority finds that since the city is seeking recovery for injuries to itself only, there is little risk of double recovery and, thus, the city withstands scrutiny under the second factor in the *Holmes* test. Furthermore, the majority finds that since the city is seeking recovery for its own harm, the general interest is best served by having the city bring this lawsuit. I disagree.

{¶71} I read *Holmes* differently. The second factor of *Holmes* is whether "recognizing claims by the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries."

Id., 503 U.S. at 269, 112 S.Ct. 1311, 117 L.Ed.2d 532.  In its complaint, the city paints a horrific picture of murder, assault, suicides, and accidental killings involving either illegal handguns or legal handguns in the hands of unauthorized users.  As a result of these violent acts, the city, "in its role of providing protection and care for its citizens, * * * provide[s] or pay[s] for additional police protection, emergency services, pension benefits, health care and other necessary services due to the threat posed by the use of defendants' products."  In addition, the city alleges harm as a result of "injuries to certain of its residents and police officers caused by the defendants' products, as well as by the loss of substantial tax revenue."

{¶72} Taking, as we must, these pleadings as true, *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753, it follows that for practically every harm the city has suffered, there is at least one injured victim standing between the city and the gun manufacturers.  In its complaint, the city states that it is seeking reimbursement for police, emergency, health, corrections, prosecution, and other services.  Support for the conclusion that this is a derivative action is found in the complaint itself, which expressly connects the city's damages to death and injuries by individual citizens allegedly resulting from illegal handguns or the use of legal handguns by unauthorized users.  This would suggest that many of the city's expenses would not have been incurred but for injuries to the primary victim.  For example, the city may incur expenses for police, emergency services, and health care when someone has been injured because of the use of an unauthorized or illegal handgun.  The injured person may also have a claim against the gun manufacturers.

{¶73} Moreover, the fact that the city seeks damages in part only for its own harm does not in and of itself satisfy the *Holmes* test.  The Second Circuit has held that economic injuries alleged by a labor union health and welfare trust fund against tobacco companies were purely derivative of physical injuries suffered by plan participants, and thus too remote to establish standing to sue.  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.* (1999), 191 F.3d 229, 239.  However,

the court also found that "even were we to assume that the single satisfaction rule would prohibit duplicative recoveries by multiple plaintiffs against a single defendant, it would not cure the ultimate problem set forth in *Holmes*, that is, that courts would be forced to 'adopt complicated rules apportioning damages.' " *Laborers Local 17* at 241, quoting *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311, 117 L.Ed.2d 532. Therefore, I would find that the application of the second factor of the *Holmes* test supports the decision of the court of appeals and the trial court.

C. Directly injured persons can remedy the harm alleged by the city

**{¶74}** What *Holmes* requires courts to analyze is not whether these damages are capable of being proven, but whether the difficulties inherent in fashioning complicated rules apportioning damages among multiple plaintiffs is justified. Thus, the third factor of *Holmes* states that because directly injured victims can generally be expected to vindicate the law "as private attorneys general" without the problems described by factors one and two, the need for courts to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct. Id., 503 U.S. at 269-270, 112 S.Ct. 1311, 117 L.Ed.2d 532. Accepting the pleadings as true, it is immediately apparent that there are unfortunately numerous directly injured victims of handgun violence in Cincinnati. One successful suit filed by a directly injured victim is every bit as much a deterrent as the instant suit and may have just as much, if not more, economic impact on the gun manufacturers. Thus, I would hold that an application of the *Holmes* test requires that we affirm the judgment of the court of appeals.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

───────────────

**COOK, J., dissenting.**

**{¶75}** Like the Chief Justice, I would find that Cincinnati's negligence-based claims are barred by remoteness principles. I write separately, however, because our views on remoteness ultimately diverge in one subtle respect. I also

write separately to illustrate why the city has failed to state cognizable claims for products liability and public nuisance.

## I

**{¶76}** I agree with much of the analysis contained in the Chief Justice's dissenting opinion. But instead of viewing remoteness principles as germane to the question of whether the city has *standing* to raise the negligence claims at issue here, I would find that the remoteness of the alleged harm precludes the city from establishing *proximate cause* as a matter of law. See *Philadelphia v. Beretta U.S.A. Corp.* (C.A.3, 2002), 277 F.3d 415. Without belaboring the difference (which is essentially academic at this point), I note that the test articulated in *Holmes v. Securities Investor Protection Corp.* (1992), 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532, cited by both the majority and the Chief Justice, analyzed remoteness in the proximate-cause context. *Id.* at 269, 112 S.Ct. 1311, 117 L.Ed.2d 532. Any relationship between remoteness and standing that can be gleaned from *Holmes* arises from proximate cause being an element of *statutory* standing under the federal RICO statute at issue in that case. See *id.* at 267-268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (analogizing to antitrust cases, which condition a plaintiff's "right to sue" on a showing of proximate cause); *id.* at 286-287, 112 S.Ct. 1311, 117 L.Ed.2d 532 (Scalia, J., concurring in judgment) (observing that proximate cause is one of the "usual elements" of statutory standing). Given that distinction, I hesitate to include a proximate-cause component within a conventional standing analysis, particularly when the negligence causes of action pleaded by the city already require proof of proximate cause as a substantive element.

## II

**{¶77}** Inasmuch as proximate cause is an essential element of a products liability claim, see *R.H. Macy & Co. v. Otis Elevator Co.* (1990), 51 Ohio St.3d 108, 110, 554 N.E.2d 1313, remoteness principles also support dismissal of the

city's causes of action sounding in products liability. Remoteness aside, however, the city's claims also fail for their failure to plead a compensable injury.

{¶78} The majority correctly determines that the city has failed to state a valid statutory claim for relief insofar as an action for purely economic harm is not maintainable under the Ohio Products Liability Act. See R.C. 2307.71(M). I disagree, however, with the majority's holding that the city may maintain its common-law products-liability claims alleging defective design and failure to warn. Even assuming that the Act does not preempt these claims, a proposition of which I am not convinced,[8] the city has not pleaded valid common-law causes of action. As the majority acknowledges, the city pleaded facts suggesting that it has suffered purely economic damages (i.e., increased municipal costs allegedly attributable to the actions of the various defendants). The majority cites no case, however, in which we have allowed products liability to be a viable theory of recovery for a plaintiff situated similarly to the city in this case—namely, a plaintiff whose economic harm is *not* attributed to having been a user, consumer, or foreseeable person present at the time of product failure. See, e.g., *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267, paragraph one of the syllabus (announcing rule of strict products liability "for physical harm * * * caused to the ultimate user or consumer"); *Lonzrick v. Republic Steel Corp.* (1966), 6 Ohio St.2d 227, 35 O.O.2d 404, 218 N.E.2d 185, paragraph two of the syllabus (allowing products-liability claim by plaintiff injured "while he was working in a place where his presence was reasonably to be anticipated by the defendant"). Today's majority appears to extend products-liability law to new categories of potential plaintiffs without any reasoned explanation of how that can be so.

---

8. See, e.g., *Carrel v. Allied Products Corp.* (1997), 78 Ohio St.3d 284, 292-294, 677 N.E.2d 795 (Cook, J., dissenting in part and concurring in part); *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 68, 661 N.E.2d 714 (Cook, J., concurring).

## III

{¶79} As to the public-nuisance cause of action, it is true that principles of remoteness do not necessarily prevent the city from stating a valid claim. See *Camden Cty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.* (D.N.J.2000), 123 F.Supp.2d 245, 264, affirmed (C.A.3, 2001), 273 F.3d 536. Nevertheless, even this cause of action fails because the reach of public-nuisance law does not go as far as the city would have us extend it.

{¶80} Admittedly, the law of nuisance appears at first glance to be broad enough to encompass virtually any type of conduct. For example, 4 Restatement of the Law 2d, Torts (1977), Section 821B, cited with approval by the majority, broadly defines what may qualify as an actionable public nuisance. Similarly, this court has described the concept of nuisance in broad terms so as to include "the doing of *anything*, or the permitting of anything under one's control or direction to be done without just cause or excuse, the necessary consequence of which interferes with or annoys another in the enjoyment of his legal rights." (Emphasis added.) *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 28 O.O. 369, 55 N.E.2d 724, paragraph two of the syllabus. Despite the arguably broad reach of the public-nuisance tort, however, judicial restraint counsels against this court extending it to the allegations of the city's complaint.

{¶81} First, the city's allegations of harm cut against holding the named defendants responsible under a public-nuisance theory. The defendants' allegedly wrongful conduct would never ripen into a public nuisance without the conduct of various unnamed third parties, such as criminals and persons who negligently allow minors to obtain guns. In other words, the defendants' marketing and distribution practices cause harm only through intervening actions of persons not within the defendants' control. Where acts of independent third parties cause the alleged harm, it cannot be said that the defendants—here, gun manufacturers, trade associations, and a gun distributor—have the requisite degree of control over the

source of the nuisance to allow liability. *Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d at 422; *Camden Cty Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 273 F.3d at 541.

{¶82} Second, to allow the public-nuisance doctrine to reach the defendants in this case amounts to an unwarranted legislative judgment by this court. By its decision today, the majority subjects the defendants to potential nuisance liability for the way they design, distribute, and market lawful products. In extending the doctrine of public nuisance in this manner, this court takes the ill-advised first step toward transforming nuisance into " 'a monster that would devour in one gulp the entire law of tort.' " *Camden Cty Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,* 273 F.3d at 540, quoting *Tioga Pub. School Dist. v. U.S. Gypsum Co.* (C.A.8, 1993), 984 F.2d 915, 921; see, also, *Philadelphia v. Beretta U.S.A. Corp.* (E.D.Pa.2000), 126 F.Supp.2d 882, 909, affirmed (C.A.3, 2002), 277 F.3d 415. Even the Restatement, which itself broadly defines the concept of nuisance, counsels courts *against* declaring a given activity to be a public nuisance "if there has been established a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct." 4 Restatement, Section 821B, Comment *f*. Where, as here, the defendants are subject to extensive federal regulation concerning their activities, the majority's decision to allow a nuisance claim is inappropriate.

{¶83} For the foregoing reasons, I respectfully dissent.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

_____

Waite, Schneider, Bayless & Chesley Co., L.P.A., Stanley M. Chesley, Paul M. DeMarco and Jean M. Geoppinger; Barrett & Weber and Michael R. Barrett; Fay D. Dupuis, Cincinnati City Solicitor, W. Peter Heile, Deputy City Solicitor, Richard Ganulin, Assistant City Solicitor; Dennis A. Henigan and Jonathan E. Lowy, Legal Action Project, Center to Prevent Handgun Violence, for appellant.

Calfee, Halter & Griswold, L.L.P., Thomas I. Michals and Mark L. Belleville; Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., and Lawrence S. Greenwald, for appellee Beretta U.S.A. Corp.

Janik & Dorman and William J. Muniak; and Harold Mayberry, Jr., for appellee American Shooting Sports Council, Inc.

Janik & Dorman and William J. Muniak; and Douglas Kliever, for appellees National Shooting Sports Foundation, Inc., and Sporting Arms and Ammunition Manufacturers' Institute, Inc.

Brown, Cummins & Brown Co., L.P.A., and James R. Cummins; Jones, Day, Reavis & Pogue and Thomas E. Fennell, for appellee Colt's Manufacturing Co., Inc.

Renzulli & Rutherford and John Renzulli, for appellee H & R 1871, Inc.

Rendigs, Fry, Kiely & Dennis, L.L.P., and W. Roger Fry; Renzulli & Rutherford and John Renzulli, for appellee Hi-Point Firearms.

Buckley, King & Bluso and Raymond J. Pelstring; Beckman & Associates and Bradley T. Beckman, for appellee North American Arms, Inc.

Thompson, Hine & Flory, L.L.P., Bruce M. Allman, Robert A. McMahon and Laurie J. Nicholson; Wildman, Harrold, Allen & Dixon, James P. Dorr and Sarah L. Olson, for appellee Sturm & Ruger Co., Inc.

Taft, Stettinius & Hollister and Thomas R. Schuck; Shook, Hardy & Bacon, L.L.P., Gary R. Long and Jeffrey S. Nelson, for appellee Smith & Wesson Corp.

Porter, Wright, Morris & Arthur, L.L.P., Mark E. Elsener and Michael E. McCarty; Bruinsma & Hewitt and Michael C. Hewitt, for appellees Bryco Arms, Inc., and B.L. Jennings, Inc.

Porter, Wright, Morris & Arthur, L.L.P., Mark E. Elsener and Michael E. McCarty; Tarics & Carrington, P.C., and Robert C. Tarics, for appellee Phoenix Arms.

Porter, Wright, Morris & Arthur, L.L.P., Mark E. Elsener and Michael E. McCarty; Budd, Larner, Gross, Rosenbaum, Greenberg & Sade and Timothy A. Bumann, for appellee Taurus International Manufacturing, Inc.

Barbara E. Herring, Toledo Director of Law, and John T. Madigan, Toledo General Counsel, urging reversal for amicus curiae city of Toledo.

Robert B. Newman, urging reversal for amici curiae American Association of Suicidology, American Jewish Congress, National Association of Elementary School Principals, National Association of School Psychologists, Ohio Public Health Association, Inc., and Physicians for Social Responsibility.

Cornell P. Carter, Cleveland Director of Law, Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A., John R. Climaco, Jack D. Maistros and Keith T. Vernon, urging reversal for amici curiae city of Cleveland and its former Mayor, Michael R. White, Educational Fund to Stop Handgun Violence, and Ohio Coalition Against Gun Violence.

Pepper Hamilton, L.L.P., and James M. Beck, urging affirmance for amicus curiae Product Liability Advisory Council, Inc.

Stanton G. Darling II, urging affirmance for amici curiae National Association of Manufacturers and Ohio Manufacturers' Association.

Vorys, Sater, Seymour & Pease, L.L.P., Daniel J. Buckley, Rebecca J. Brinsfield and Margaret A. Nero, urging affirmance for amici curiae Amateur Trapshooting Association, Fairfield Sportsmen's Association, Inc., Hidden Haven, Inc., Shooting Preserve & Sporting Clays, National Wild Turkey Federation, Whitetails Unlimited, and Wildlife Conservation Fund of America.

————————————