O’Connor, C.J.,
dissenting.
{¶ 123} This appeal illustrates the nexus of complex financial, social, and legal phenomena that have arisen in the wake of what is commonly called the Great Recession (generally considered to have been most severe in this country from December 2007 through June 2009), which left many Americans with decreased net worth and engendered the longest periods of unemployment since the World War II era. See generally Warner, What the Great Recession Has Done to Family Life, New York Times Magazine (Aug. 6, 2010), available at http://www. nytimes.com/2010/08/08/magazme/08FOB-wwln-t.html?_r=2&ref=magazme& (accessed May 12, 2016); see also Jobless Debt Is Heavy, Columbus Dispatch (Aug. 13, 2014), available at http://www.dispatch.com/eontent/stories/editorials/ 2014/08/13/jobless-debt-is-heavy.html (accessed May 12, 2016). Not surprisingly, many Americans incurred debts that they were unable — or perhaps unwilling — to pay. The decedent in this case appears to have been one such American, but the record before us does not establish why her debts were not paid.[2]
*664 {¶ 124} The amounts of unpaid debt in the United States are staggering. In 2008, credit-card lenders “wrote off’ about $45 billion in bad debt. Dash & Martin, Banks Brace for Credit Card Write-Offs, New York Times (May 10, 2009), available at http://www.nytimes.com/2009/05/ll/business/llcredit.html?j,= 0 (accessed May 19, 2016). As troubling as that number is, financial institutions charged off about $20 billion each quarter from early 2009 through early 2010. Hauser, Bank Losses Lead to Drop in Credit Card Debt, New York Times (Sept. 24, 2010), available at http://www.nytimes.com/2010/09/25/business/25credit.html (accessed May 19, 2016).
{¶ 125} Terms such as “write-off’ and “charge-off’ are based on accounting principles and are used to describe the situation in which a creditor has determined that a debt is unlikely to be paid, usually after 180 days without payment, and “charges off’ the account receivable as uncollectable. Fox, Do We Have A Debt Collection Crisis? Some Cautionary Tales of Debt Collection in Indiana, 24 Loy.Consumer L.Rev. 355, 358 (2012), fn. 16; Haneman, The Ethical Exploitation of the Unrepresented Consumer, 73 Mo.L.Rev. 707, 713 (2008). The real debt, however, does not magically disappear. The companies owed the debt suffer the loss of that money, and ultimately they shift the burden of paying the debt to other credit-card holders through higher interest rates and fees. Fox at 362. And there are plenty of credit-card holders bearing that burden. In 2015, the average American household carried about $5,700 in credit-card debt; about 38 percent of households carried an average debt that was more than $15,000. Gabler, The Secret Shame of Middle-Class Americans, The Atlantic (May 2016), available at http://www.theatlantic.com/magazine/archive/2016/05/my-secret-sha me/476415/ (accessed May 19, 2016). Although the number of people holding credit-card debt has been decreasing over the last few years, notably, the average debt for those households that do carry a balance has been on the rise. Id. In a sense then, credit-card companies are charging those people for both the costs they incur as they attempt to pay off their debts and the costs that others incurred but were unable to pay.
{¶ 126} Companies also engage in the sometimes unsavory, but now common, phenomenon of “debt sales” in which a creditor sells an individual’s debt, for pennies on the dollar, to a private entity that then attempts to collect the debt, often through the court process. And the collection efforts include efforts to collect “charged-off’ debts:
*665 To recoup a portion of its lost investment, an originating lender may sell a charged-off consumer loan to a Debt Buyer, usually as part of a portfolio of delinquent consumer loans, for a fraction of the total amount owed to the originating lender. * * * Once a Debt Buyer has purchased a portfolio of defaulted consumer loans, it may engage in collection efforts (or hire a third-party to do so), which may include locating borrowers, determining whether borrowers are in bankruptcy, commencing legal proceedings, or “otherwise encouraging” payment of all or a portion of the delinquency.
Debt Buyers’ Assn. v. Snow, 481 F.Supp.2d 1, 4 (D.D.C.2006), quoting a memorandum filed in the case.
{¶ 127} It is undisputable that some debt collectors, whether first party or third party, act unlawfully and unconscionably in the process of attempting to collect the debt. The majority raises valid criticisms of those debt purchasers who “reap staggering profits by methodically cleaning financial carcasses left abandoned” years ago. Haneman, 73 Mo.L.Rev. at 713.
{¶ 128} But the majority’s characterization of the debt market ignores the reality that there would be no debt to purchase if there had not been so many defaults on debts. In fact, there is plenty of blame to go around.
{¶ 129} The Federal Trade Commission’s (“FTC”) recent report of the results of a landmark study of the debt-purchasing industry, upon which the majority relies heavily, analyzed more than 5,000 debt portfolios purchased by large debt buyers in a three-year study period ending in June 2009. The Structure and Practices of the Debt Buying Industry ii, A-l (Jan. 2013), available at http://www. ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf (accessed May 19, 2016) (“Structure and Practices ”). Those portfolios contained nearly 90 million consumer accounts that had a face value of $143 billion. Id. at ii. Sixty-two percent of that debt was credit-card debt. Id.
{¶ 130} The study makes clear that information received by debt purchasers, including information about whether the consumer had ever disputed the debt, is deficient in many ways. Id. at ii-iii. Yet only 3.2 percent of the consumers whose debt was purchased disputed the debts, and the debts in more than half of those cases were verified by the debt buyer. Id. at iv. Debt-purchasing companies resold only 2.9 percent of their disputed debts and only 0.8 percent of their unverified disputed debts. Id. Thus, although some debt buyers undoubtedly bought disputed debts, the vast majority of them did not.
{¶ 131} Similarly, although some debt buyers involved in the study purchased and attempted to collect debts that were more than six years old, the FTC also *666 found that “most of the debt that [debt buyers] purchased did not appear to be either old or beyond the statute of limitations.” Id. at v.
{¶ 132} And, for better or worse, the FTC acknowledged that debt buying can reduce creditors’ losses and thereby allow for more credit to be provided to consumers at better rates. Id. at i.
{¶ 133} Much more could be said about the business of debt buying, but for now, it suffices for two things to be made clear.- First, the debt market involves both the bad behaviors of irresponsible consumers and the tragedies of responsible ones. Second, despite the majority’s recitation of the misdeeds of debt collectors and its broad-brush imputation of those misdeeds to the industry as a whole, nothing in the record before us establishes that these appellants — Cheek Law Offices, L.L.C., and attorney Parri Hockenberry (collectively “Cheek”), First Resolution Investment Corporation (“FRIC”), and First Resolution Management Corporation — necessarily acted wrongly in seeking to collect an established debt.
{¶ 134} I understand the majority’s indignation with perceived injustices, but I cannot join its analysis, which is driven by the result it seeks to achieve rather than thoughtful considerations of precedent and public policy. And therein lies the rub: the majority’s grandiose statements and holdings, though intended to protect Ohio’s consumers, portend great harm to them and to the vitally important plaintiffs’ bar — the holdings will inevitably be applied as precedent in future cases in ways that will not be consumer friendly.
{¶ 135} I dissent.
{¶ 136} The proper analysis of the claims in this case should lead to the conclusion that Ohio law controls both the substantive and procedural aspects involved. I would hold that under Ohio law, the complaint was timely filed and therefore that appellants did not violate the Ohio Consumer Sales Practices Act (“OCSPA”), R.C. 1345.01 et seq., or the federal Fair Debt Collection Practices Act (“FDCPA”), 15 U.S.C. 1692 et seq., by bringing a time-barred suit against the decedent. I would also hold that appellants did not violate the OCSPA or the FDCPA by requesting the rate of interest in the prayer for relief in the complaint against the decedent that they sought. I would reverse the judgment of the court of appeals and enter judgment in favor of appellants, as the trial court did.
ANALYSIS
{¶ 137} As the trial court recognized early in these proceedings, the outcome in this case turns on whether the procedural and substantive law of Ohio or that of another state controls.
*667 Ohio Procedural Law Controls

Ohio’s procedural law on statutes of limitations

{¶ 138} The key to the majority’s holding in favor of the decedent’s estate is that Ohio’s borrowing statute, R.C. 2305.05, applies in this case. It does not.
{¶ 139} It is well settled, in Ohio that the forum state’s statutes of limitations are to be applied in the forum, which, here, is Ohio. “The matter of the statute of limitations being a question of remedy, it is universally considered to be governed by the law of the forum.” McCormick v. Taft, 61 Ohio App. 200, 201, 22 N.E.2d 510 (1st Dist.1938). Because the forum for the underlying suit is a court in Ohio, Ohio law controls the statute-of-limitations question.[3] See, e.g., Kerper v. Wood, 48 Ohio St. 613, 622, 29 N.E. 501 (1891) (“Statutes of limitation relate to the remedy, and are, and must be, governed by the law of the forum; for it is conceded that a court which has power to say when its doors shall be opened has also power to say when they shall be closed”). See also Alropa Corp. v. Kirchwehm, 138 Ohio St. 30, 33 N.E.2d 655 (1941), paragraph one of the syllabus *668 (“The validity and interpretation of a contract are governed by the laws of the state where such contract is made or is to be performed; but the remedies are governed by the laws of the state where the suit is brought. The limitation of actions relates to the remedy”); Unifund CCR Partners Assignee of Palisades Collection, L.L.C. v. Childs, 2d Dist. Montgomery No. 23161, 2010-Ohio-746, 2010 WL 703274, ¶ 14 (“ ‘In choice-of-law situations, the procedural laws of the forum state, including applicable statutes of limitations, are generally applied’ ”), quoting Lawson v. Valve-Trol Co., 81 Ohio App.3d 1, 4, 610 N.E.2d 425 (9th Dist.1991), citing Howard v. Allen, 30 Ohio St.2d 130, 283 N.E.2d 167 (1972); D.A.N. Joint Venture III, L.P. v. Armstrong, 11th Dist. Lake No. 2006-L-089, 2007-Ohio-898, 2007 WL 634457, ¶ 28 (Ohio courts have consistently and uniformly held that limitations of actions are fixed by the laws of the state in which suit is filed); Combs v. Internatl. Ins. Co., 354 F.3d 568, 577 (6th Cir.2004) (a federal court sitting in diversity must apply the procedural law of the forum state, including the forum state’s statute of limitations).
{¶ 140} The majority pays lip service to these principles, but it meanders through a muddied analysis that obfuscates the law for debtor and creditor alike so that it can hold that Delaware’s statute of limitations applies. The majority accordingly reaches the outcome desired by both it and the decedent’s estate: that FRIC’s claims were time-barred when it filed its complaint against the decedent.

Application of the borrowing statute

{¶ 141} For R.C. 2305.03(B) to apply here, there necessarily must first be a finding that the cause of action accrued in a different jurisdiction than Ohio. See Combs v. Internatl. Ins. Co., 163 F.Supp.2d 686, 691 (E.D.Ky.2001) (“borrowing statute is triggered only when the cause of action accrued in another jurisdiction” [emphasis sic]), aff'd, 354 F.3d 568 (6th Cir.2004). The trial court in this case was presented with conflicting arguments on that point and found little controlling case law. Ultimately, it found the holdings by the federal trial and appellate courts in Combs to be “most persuasive in assisting this Court in its determination of where the present case ‘accrued.’ ”
{¶ 142} In Combs, a federal trial court applying Kentucky law in a diversity case was confronted with a choice-of-law accrual question in a dispute involving the alleged breach of an insurance contract. In a thorough analysis, that court concluded that a cause of action for payment of money allegedly due accrues where the decision to deny payment was made. 163 F.Supp.2d at 692-695.
{¶ 143} Applying Combs, the trial court in this case held that the breach occurred in Ohio because the decedent made the decision not to make her payments while she was in Ohio:
*669 The Court finds that Ohio, where [the decedent] resides, primarily used the credit card, and decided to stop making the minimum required payments on her credit card, was where the breach of the agreement occurred. The fact that [the decedent] was required to mail payments to Delaware does not determine where the breach occurred — or where the action accrued. There is evidence that, for some period of time, [the decedent] was mailing payments to Illinois, rather than Delaware. She could have also chosen to make her payments on the Internet, by telephone, or to a Chase bank branch. The location where she sent her payments seems less significant in this case than the place where [the decedent] decided to stop making payments. In summary, the Court finds that [FRIC’s] actions accrued in Ohio. For this reason, the Court finds that Ohio’s statute of limitations applies to the present case.
(Emphasis sic.)
{¶ 144} I agree with the trial court’s approach — which is grounded in law and common sense — that the location where the debtor lives, primarily uses the card, and decides not to make the payments is more significant to the breach than the place where payments would have been sent if there had been no breach. See, e.g., Combs, 163 F.Supp.2d at 692-695. Because I would find that the cause of action accrued in Ohio, I would hold that the borrowing statute is inapplicable here.
{¶ 145} Conversely, the majority’s view, in essence, is that Ohio consumers who are solicited with credit-card applications in Ohio, complete the applications in Ohio and mail the applications from Ohio, then receive the credit cards in Ohio and use the credit cards in Ohio, nevertheless would be better served by having the law of Delaware — or whichever state they mailed their payments to — apply to any claims arising from the credit-card agreements.
{¶ 146} Notably, however, the place where a creditor is incorporated or requests to receive its payments should not be controlling, given that “Congress’ purpose in passing the FDCPA was ‘to prevent debt collectors from bringing collection suits in forums located at great distances from debtors’ residences.’ ” Harrington v. CACV of Colorado, L.L.C., 508 F.Supp.2d 128, 134 (D.Mass.2007), quoting Dutton v. Wolhar, 809 F.Supp. 1130, 1139 (D.Del.1992), citing S.Rep. No. 95-382, at 5, reprinted in 1977 U.S.Code Cong. & Adm.News 1695, 1699. And the borrowing statute was designed to prevent a plaintiff from forum shopping when the plaintiffs claims have expired, Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc., 852 F.Supp.2d 925, 932 (S.D.Ohio 2012).
{¶ 147} As the majority acknowledges, Ohio’s borrowing statute, in essence, “directs a forum court to ‘borrow’ the limitation period of another state if the *670 cause of action accrued in that foreign state and that state’s limitation period is shorter than the forum state’s limitation period.” Majority opinion at ¶ 37, citing Dudek v. Thomas & Thomas Attorneys & Counselors at Law, L.L.C., 702 F.Supp.2d 826, 835 (N.D.Ohio 2010), citing Combs, 354 F.3d at 578, and CMACO Automotive Sys., Inc. v. Wanxiang Am. Corp., 589 F.3d 235, 244 (6th Cir.2009).
{¶ 148} The better-reasoned analysis of precedent mandates a determination that the cause of action in this case accrued in Ohio, because an Ohio consumer executed a contract for a credit card in Ohio, made purchases with that card in Ohio, and defaulted on the debt in Ohio. As one court explained in considering a choice-of-law dispute involving a Chase credit card issued to an employee of an Ohio corporation, because the credit-card agreement “was applied for and signed in Ohio and, as the card was used by an Ohio corporation, its primary effect was. in Ohio.” Heiges v. JP Morgan Chase Bank, N.A., 521 F.Supp.2d 641, 646 (N.D.Ohio 2007). The trial court in this case properly found that public-policy considerations also support the conclusion that Ohio is where the cause of action accrued, because the primary effect of the credit-card agreement was in Ohio.
{¶ 149} The majority looks to only one aspect of the history of the case and elevates that fact — the place where payments were sent — to be dispositive. In doing so, it ignores the many compelling facts that indicate strongly that Ohio interests predominate in this case: at all times relevant here, the decedent was an Ohio resident, she applied for the card from her residence in Ohio, and her decision not to make the payments due on her account was a decision made in Ohio. Thus, the proper result is to hold that the cause of action accrued in Ohio, Combs, 163 F.Supp.2d at 692-695; Heiges at 646, and because it accrued in Ohio, R.C. 2305.03(B) is inapplicable and Ohio law controls the determination of the statute of limitations, Combs at 691.
{¶ 150} The majority clings to Meekison v. Groschner, 153 Ohio St. 301, 91 N.E.2d 680 (1950), even though Meekison itself recognized that there is abundant authority for the view that a cause of action accrues where the contract is to be performed or where the breach occurs. Id. at 306. And Meekison is fundamentally distinguishable from this case because it involved a simple note, executed in Michigan by Michigan residents, that was required to be paid six months later “at Napoleon, Ohio” pursuant to the explicit terms of the note. Id. at 302-303.
{¶ 151} In litigation involving simple, short-term contracts like basic promissory notes, the rule stated in Meekison works well. But it retains little vitality in the context of contemporary credit-card-collection cases, which arise from monthly accountings of credit advanced by lenders to consumers for purchases and the interest or other charges that accrue with that credit, routine defaults on the required payments, and the frequent inability of consumers and creditors to *671 maintain adequate records of the underlying contracts establishing credit-card accounts. It is no wonder that until today, no court in America has ever applied Meekison in a reported decision involving a credit-card debt; and it has been 35 years since an Ohio appellate court last cited Meekison in any context. Its holding should not be imported to the credit-card context presented by this case.
Improper Application of Substantive Law
{¶ 152} Despite the majority’s haste to conclude that the cause of action accrued in Delaware and therefore that Delaware law controls the statute of limitations, the majority then ignores Delaware law in its analysis of the substantive issues before us. I am left to wonder why, if the cause of action accrued in Delaware, the majority’s analysis is absolutely devoid of any discussion of Delaware substantive law. This is particularly of concern given that the decedent’s attorneys provided the trial court with a Chase “cardmember agreement” as an exhibit to a filing in that court, and that agreement clearly states that the terms and enforcement of the cardholder agreement and the decedent’s account were governed by federal law, “AND, TO THE EXTENT STATE LAW APPLIES, THE LAW OF DELAWARE, * * * WHERE WE AND YOUR ACCOUNT ARE LOCATED, WILL APPLY NO MATTER WHERE YOU LIVE OR USE THE ACCOUNT.” (Capitalization sic.) I suspect that the majority wholly ignores Delaware law in its analysis because it cannot use Delaware law to reach the result it wants. Whatever its reasoning may be, it is clear that the majority applies Ohio law to the substantive issues without any explanation of why Ohio law controls.
{¶ 153} Even assuming that Ohio law controls the resolution of the substantive issues, the majority’s analysis is unsatisfying.
{¶ 154} The majority erroneously concludes that any cause of action against the decedent accrued in Delaware because the decedent failed to make payments to Chase in Delaware. In doing so, it ignores the record before us — premised on its belief that all of the decedent’s payments were sent to Delaware — when, in fact, the decedent’s attorneys submitted a document obtained during discovery to the trial court establishing that she mailed payments to Delaware and Illinois, and the trial court relied on that evidence in considering where the cause of action accrued. If, as the majority concludes, the place of payment is dispositive, then the majority should address why Illinois law is irrelevant to the analysis.
{¶ 155} But that aside, the lead opinion’s analysis of the date the cause of action accrued in this case is not sufficient.
{¶ 156} FRIC contended during discovery that the cause of action accrued on January 1, 2005, the date that the decedent “first failed to make her minimum [monthly] payment and defaulted on her obligation.” The decedent did not clearly dispute that date, but in her amended counterclaim against FRIC and *672 Cheek, she alleged that the cause of action accrued “at the latest” on August 10, 2006, a date one month after her last payment on the delinquent account. But the decedent never established that the 2006 date was the date the cause of action accrued, and she never established that FRIC’s assertion that the causé of action accrued in 2005 was erroneous. The trial court found that the cause of action accrued in January 2005, and the lead opinion adopts that as the time of accrual.
{¶ 157} The author of the concurring opinion agrees with the majority’s analysis and disposition of this appeal, except that the author of that opinion asserts that the cause of action did not accrue until June 28, 2006, the date on which the decedent made her last payment. The report produced by the FTC mentioned earlier suggests that the view expressed in the concurring opinion is consistent with the law of most states, i.e., that “a partial payment on a time-barred debt revives the entire balance of the debt for a new statute of limitations period.” Structure and Practices at 47. And at least one Ohio appellate court has adopted a similar view. Midland Funding, L.L.C. v. Hottenroth, 2014-Ohio-5680, 26 N.E.3d 269, ¶ 24 (8th Dist.) (“Typically, the making of a partial payment on an open account before the statute of limitations expires extends the implied promise to pay the balance owed amount, acting to renew the statute of limitations period”), appeal accepted and held for decision in this case, 142 Ohio St.3d 1464, 2015-Ohio-1896, 30 N.E.3d 973; see also Himelfarb v. Am. Express Co., 301 Md. 698, 705, 484 A.2d 1013 (1984). And one federal court, applying Delaware law, has noted that “[djetermining whether a debt is time-barred is not always a simple task,” because courts have to “consider many factors, such as the charge-off date, tolling issues, revival issues, and any actions between the debtor and creditor that may have modified their original agreement.” Riffle v. Convergent Outsourcing, Inc., 311 F.R.D. 677, 684 (M.D.Fla.2015), citing Hart v. Deshong, 40 Del. 218, 8 A.2d 85 (Super.1939) (Delaware law recognizes that an unconditional acknowledgement of a debt or a payment on an account can extend the statute of limitations to collect the debt).
{¶ 158} Given the majority’s ultimate holding that Delaware’s statute of limitations applies, I need not opine on whether the lead opinion or the opinion concurring with it is correct. I expressly use the time of accrual adopted by the lead opinion solely for purposes of evaluating the propriety of other aspects of the lead opinion.
{¶ 159} If the lead opinion is correct in its determination of the time of accrual, the lead opinion’s summary analysis permitting the retroactive application of Ohio’s borrowing statute is not proper.[4]
*673 {¶ 160} Ohio’s current borrowing statute, R.C. 2305.03(B), became effective on April 7, 2005. Am.Sub.S.B. No. 80, 150 Ohio Laws, Part V, 7915, 7930-7931, 8037; see Dudek, 702 F.Supp.2d at 836. The borrowing statute cannot be applied retroactively to deprive a party of the right to sue on an accrued substantive right, including for breach of contract. See Ohio Constitution, Article II, Section 28 (“The General Assembly shall have no power to pass retroactive laws”); Gregory v. Flowers, 32 Ohio St.2d 48, 290 N.E.2d 181 (1972), paragraph three of the syllabus (“When the retroactive application of a statute of limitation operates to destroy an accrued substantive right, such application conflicts with Section 28, Article II of the Ohio Constitution”). As Judge O’Malley wrote in Dudek, a case on which the lead opinion relies, there is not an iota of authority supporting retroactive application of the borrowing statute:
It is well-established that, in the absence of a “clear pronouncement by the General Assembly that a statute is to be applied retrospectively, a statute may be applied prospectively only.” State v. LaSalle, 96 Ohio St.3d 178, [2002-Ohio-4009,] 772 N.E.2d 1172 [¶ 14]; see also State v. Brooks, 163 Ohio App.3d 241, [2005-Ohio-4728,] 837 N.E.2d 796 [¶ 13, (4th Dist.)] (“In determining whether a statute is unconstitutionally retroactive, a court must first determine whether the General Assembly intended it to apply retroactively. In the absence of such an express finding by the General Assembly, the presumption of prospective application may not be overcome, and the court’s inquiry into whether the statute may be constitutionally applied retrospectively ends” [citations and footnote omitted]).
Nothing in the language of O.R.C. § 2305.03(B) demonstrates that the Ohio General Assembly intended the statute to apply retroactively. The Court has not located any case law suggesting that the legislature intended O.R.C. § 2305.03(B) to apply retroactively, and the parties have cited none. And, the few courts that have considered this issue have held that the borrowing statute cannot be applied retrospectively. Curl [v. Greenlee Textron, Inc.], 404 F.Supp.2d [1001,] at 1008 [(S.D.Ohio 2005)] (“[T]here [is] no precedent showing that Ohio courts would apply § 2305.03 retroactively”); D.A.N. Joint Venture III, L.P. v. Armstrong, [11th Dist. Lake] No. 2006-L-089, 2007-Ohio-898, ¶ 29, 2007 WL 634457 (Ohio Ct.App.2007) (“Amended R.C. 2305.03(B) cannot be applied retroactively * * *”); Ormond v. Anthem, Inc., No. 05-cv-1908, 2008 WL 906157, *19, n. 12, 2008 U.S. Dist. LEXIS 30230, *59, n. 12 (S.D.Ind. Mar. 31, 2008) (“There is no evidence that the Ohio General Assembly intended its borrowing statute to be applied retrospectively”).
*674 (Footnote omitted.) Dudek, 702 F.Supp.2d at 836-837.
{¶ 161} The lead opinion concedes that the effective date of the borrowing statute — the linchpin of its analysis designed to invoke Delaware’s statute of limitations — was more than three months after the date the lead opinion determines the cause of action accrued. But it nevertheless retroactively applies the borrowing statute to appellants, blithely asserting that “ ‘ “[a] period of limitations already running may also be shortened by the legislature” as long as “a period sufficiently long to allow a reasonable time to begin suit” is allowed.’ ” Lead opinion at ¶ 57, quoting State ex rel. Nickoli v. Erie MetroParks, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, ¶ 29, quoting 1A Sackman, Nichols on Eminent Domain, Section 4.102[3], at 4-74 (3d Ed.2006). The lead opinion suggests that the statute of limitations can be reduced from six years to three years, because “even with that shortening, there existed a reasonably long period of time for FRIC to file suit,” and therefore the lead opinion concludes that applying the borrowing statute to this case is not unconstitutional despite its retroactive application. Lead opinion at ¶ 58.
{¶ 162} But the opinion does not tell us why or how three years is “reasonably long,” particularly when three years not only halves Ohio’s six-year statute of limitations, but also obliterates FRIC’s claim while breathing life into the decedent’s counterclaims. The borrowing statute cannot be employed retroactively to create such a result. See Cook v. Matvejs, 56 Ohio St.2d 234, 237, 383 N.E.2d 601 (1978). Indeed, the lead opinion itself quotes our prior holding that the “ ‘ “retroactivity clause nullifies those new laws that ‘reach back and create new burdens, new duties, new obligations, or new liabilities not existing at the time [the statute becomes effective].’ ” ’ ” (Emphasis added.) Lead opinion at ¶ 55, quoting Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce, 127 Ohio St.3d 511, 2010-Ohio-6207, 941 N.E.2d 745, ¶ 14, quoting Bielat v. Bielat, 87 Ohio St.3d 350, 352-353, 721 N.E.2d 28 (2000), quoting Miller v. Hixson, 64 Ohio St. 39, 51, 59 N.E. 749 (1901). It then wholly ignores the teaching of that precedent, despite the fact that applying the borrowing statute in this case clearly imposes new duties and liabilities on appellants who, prior to today, were not forbidden from attempting to collect the decedent’s debt and now are even being subjected to liability for doing so.
No Violation of the Consumer-Protection Statutes Occurred in this Case
{¶ 163} I agree, as a general matter, that debt collectors, including attorneys engaged in debt collections, can be held liable under both the OCSPA and the FDCPA. Heintz v. Jenkins, 514 U.S. 291, 299, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). But I dissent strongly from the majority’s conclusions that because appellants brought a claim that the court today declares was time-barred under *675 Delaware law and because appellants requested interest in an amount in excess of Ohio’s statutory interest rate, they are potentially liable under both statutory schemes. The majority’s flawed analyses of these two issues not only improperly subject appellants to liability in this case, those analyses portend great risk for all plaintiffs and their attorneys in future cases.
{¶ 164} As already explained, I would hold that the complaint was timely filed, and therefore I reject the notion that the mere filing of the complaint can be a statutory violation or can give rise to a potential abuse-of-process claim. More importantly to the appellants before us is the fact that prior to this court’s holding today, there was ample precedent to support a debt collector bringing suit in an Ohio court against an Ohio debtor for a debt that was less than six years old. Appellants’ suit was not frivolous — nor was it sanetionable under the civil rules — when the complaint was filed.[5] Liability should not be imposed on these appellants for not being sufficiently prescient to predict an outcome to this appeal that even most justices of this court likely did not expect.
{¶ 165} Turning my focus to the issue of the amount of interest set forth in the prayer in the complaint, the notion that FRIC’s demand for 24 percent interest in the complaint giving rise to this suit violated the FDCPA and the OCSPA requires more analysis. Although I agree with the decedent’s estate that FRIC ultimately did not establish that it was entitled to interest at the rate claimed in the complaint,[6] I disagree with the estate’s contention — and the majority’s determination — that demanding that rate in a complaint potentially violated the FDCPA and the OCSPA.
*676 {¶ 166} FRIC contends that it cannot be held liable under the FDCPA and the OCSPA for asserting in its complaint that it was entitled to an interest rate of 24 percent. Having carefully evaluated precedent for both positions, I would adopt the view of most jurisdictions, which supports FRIC’s position and is better reasoned and consistent with both common law and the intent and goals of the FDCPA. Several rationales are central to my conclusion.
{¶ 167} First, seeking damages, costs, and attorney fees in a complaint is distinguishable from other conduct a debt collector may engage in. As one federal district court in Ohio has explained in dismissing a FDCPA claim that was based on the debt collector’s prayer for relief:
[A] prayer for relief does not constitute a representation that the defendant must pay the amount listed, nor that the creditor is entitled to these additional amounts. The prayer for relief is not a demand to the debtor himself. Rather, the prayer for relief is what it purports to be — a prayer or request directed to the court. The FDCPA does not extend protection to communications to courts. See, e.g. O’Rourke v. Palisades Acquisition XVI, L.L.C., 635 F.3d 938, 940-41, 944 (7th Cir.2011) (“the Fair Debt Collection Practices Act does not extend to communications that would confuse or mislead a state court judge”).
Hrivnak v. NCO Portfolio Mgt., 994 F.Supp.2d 889, 898 (N.D.Ohio 2014).
{¶ 168} Another federal district court has explained the rationale for rejecting the argument that a debt collector violates the FDCPA by making a claim for attorney fees in a complaint to recover the debt from the creditor:
A prayer for relief in a complaint, even where it specifies the quantity of attorney’s fees, is just that: a request to a third party — the court — for consideration, not a demand to the debtor himself. A request for attorney’s fees ultimately rests upon the discretion of the court and a determination of applicability at a later stage of the litigation. The whole purpose of regulating debt collection was to “supervise” a range of unsupervised contacts, such as demand letters and late-night telephone calls. In contrast, a statement in a pleading is supervised by the court and monitored by counsel. The two situations are drastically different.
(Footnote omitted.) Argentieri v. Fisher Landscapes, Inc., 15 F.Supp.2d 55, 61-62 (D.Mass.1998.)
*677 {¶ 169} Other federal courts around the country have adopted rationales similar to Hrivnak and Argentieri. See, e.g., Sayyed v. Wolpoff & Abramson, L.L.P., 733 F.Supp.2d 635, 649 (D.Md.2010) (holding that a prayer for attorney fees was “a request directed to the court, not a communication directed to the debtor, and certainly not a misrepresentation”); Winn v. Unifund CCR Partners, D.Ariz. No. CV 06-447-TUC-FRZ, 2007 WL 974099, *3 (Mar. 30, 2007) (a prayer for relief “is what it purports to be — a ‘prayer’ or request for a certain amount of attorney’s fees”); Rael v. Davis, S.D.Ind. No. 1:06-cv-0081-JDT-TAB, 2006 WL 2346396, *5 (Aug. 11, 2006) (holding that a request for attorney fees in a complaint was a request to the court, not a demand on the debtor, and noting that “resolution of the request ultimately would depend on future events and the judgment of the state court judge”). As the Seventh Circuit has noted,
Whatever shorthand appeared in the complaint * * * was harmless rather than an effort to lead anyone astray. It was the judge, not [the debtor], who had to be able to determine to whom the debt was owed, for it is the judge (or clerk of court) rather than the defendant who prepares the judgment specifying the relief to which the prevailing party is entitled.
Beler v. Blatt, Hasenmiller, Leibsker & Moore, L.L.C., 480 F.3d 470, 473 (7th Cir.2007).
{¶ 170} Only a few cases have addressed the specific context of a prayer for interest in a complaint that seeks to collect a debt. I agree with those that have adopted and applied the rationale in Argentieri to cases in which interest is sought in a complaint. See, e.g., Hart v. Pacific Rehab of Maryland, P.A., D.Md. No. ELH-12-2608, 2013 WL 5212309, *23 (Sept. 13, 2013) (holding that a request for prejudgment interest in a complaint is akin to a request to a court for attorney fees and is not actionable as an improper FDCPA representation); Bird v. Pressler & Pressler, L.L.P., E.D.N.Y. No. 12-CV-3007(JS)(ETB), 2013 WL 2316601, *2 (May 28, 2013) (applying Argentieri and finding no FDCPA violation because a complaint’s “prayer for relief of pre-judgment interest is a request upon the Court”).
{¶ 171} Put another way, demands made in a complaint are “aspirational” requests, not absolute statements of entitlement. Cisneros v. Neuheisel Law Firm, P.C., D.Ariz. No. CV06-1467-PHX-DGC, 2008 WL 65608, *3 (Jan. 3, 2008) (noting that the “fact that the prayer alleges a special amount is no more binding on Plaintiff than any other factual allegation in the complaint” and that “the prayer for relief is aspirational — it describes what the collection agency seeks if it prevails, including ‘such other and further relief as the Court may deem just and proper’ ”).
*678 {¶ 172} Indeed, Ohio law has long held that the prayer is not a dispositive portion of the complaint. “The prayer of a petition is no part of the cause of action, but merely indicates the object thereof, the remedy sought or the legal consequences of the facts set forth in the petition. It is a mere incident to the petition.” Harbage v. Ferguson, 27 Ohio Law Abs. 227, 229, 1938 WL 3192 (C.P.1938). See also Martini v. Cicatiello, 74 Ohio Law Abs. 289, 292, 140 N.E.2d 336 (7th Dist.1955), quoting 19 American Jurisprudence, Equity, Section 226, at 181 (1939) (“ ‘Prayers for relief are special or general, and the cautious pleader includes both in his bill. In the special prayer, the complainant indicates the particular relief which he deems suited to his case and asks the court to grant that relief; in the prayer for general relief, he merely asks that he may have “such other, further, and general relief as he may be entitled to ” ’ ” [footnote deleted and emphasis added]). In other words, the prayer merely reflects what the plaintiff seeks from the court, but the complaint sets forth the theory of the case, and the evidence on damages adduced in discovery and/or presented at trial controls the relief that the court ultimately orders. See James H. Herron Co. v. Jones, 28 Ohio App. 190, 197, 162 N.E. 624 (8th Dist.1927); McGurrer v. Holliday, 15 Ohio Dec. 753, 754, 1905 WL 1273 (C.P.1905). Until today, the prayer alone has not been regarded as dispositive in determining the nature of the cause of action. Goldstein v. Rousey, 8 Ohio Law Abs. 439, 440, 1930 WL 2164 (1st Dist.1930); accord Roller v. Patrick, 145 Ohio St. 572, 579, 62 N.E.2d 367 (1945). “[T]he prayer of a pleading is no part of the cause of action, and the relief which may be given may be different than that asked for in the prayer, but the prayer may be examined to determine what the pleader intends by his pleading and the relief he is seeking and supposes he is entitled to receive.” Parker v. Cent. Mfrs. Mut. Ins. Co., 98 Ohio App. 169, 176, 128 N.E.2d 440 (3d Dist.1953). The character of a claim should continue to be determined by the contents of the entire complaint, and not, as the majority does here, by focusing solely on the prayer. See Martini at 292.
{¶ 173} The court of appeals in this case distinguished this matter from Argentieri and instead relied upon Foster v. D.B.S. Collection Agency, 463 F.Supp.2d 783 (S.D.Ohio 2006). The majority embraces Foster as well. But Foster is wholly inapposite here.
{¶ 174} The court in Foster found that a violation of 15 U.S.C. 1692e(2)(b) occurred because a request for attorney fees — not for interest — was made upon the debtors despite the fact that such fees were categorically barred by an Ohio statute, former R.C. 1301.21 (proscribing creditors from recovering attorney fees incurred during litigation to collect “personal, family or household” debt). Id. at 802. Foster turned on the court’s determination that the demand in the complaint “constituted an absolute entitlement to attorney fees, even though such fees are not recoverable under Ohio law.” Id.
*679 {¶ 175} Similarly, the other courts that have found parties potentially liable under the FDCPA based on prayers in complaints have focused on the fact that the relief sought in the prayers was impossible or improper as a matter of law. See, e.g., LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1193, 1195-1198 (11th Cir.2010) (liability could arise from a debt collector’s threat to file a lawsuit when the debt collector had failed to comply with a statutory requirement to register as a debt collector and therefore could not legally bring suit); Bradshaw v. Hilco Receivables, L.L.C., 765 F.Supp.2d 719, 729-730 (D.Md.2011) (viewing the filing of a debt-collection lawsuit without the required statutory license as “a threat to take * * * action that cannot legally be taken” under 15 U.S.C. 1692e(5)); Russey v. Rankin, 911 F.Supp. 1449, 1454 (D.N.M.1995) (a debt collector’s letter threatening to file a collection lawsuit when the debt collector could not file a lawsuit in its own name was an action that could not legally be taken). See also Harrington, 508 F.Supp.2d at 136 (a fraudulent motion for default judgment is a “threat to take action that cannot legally be taken” in violation of 15 U.S.C. 1692e(5)).
{¶ 176} The majority relies heavily on the Sixth Circuit’s decision in Stratton v. Portfolio Recovery Assocs., L.L.C., 770 F.3d 443 (6th Cir.2014) to hold that a mere request in a complaint for interest that is not available violates the FDCPA. But as Judge Batchelder explained in her dissent in Stratton, that opinion is built on shaky foundations:
Particularly pernicious is the majority’s holding that Stratton has stated a claim under [15 U.S.C.] § 1692e(5). Section 1692e(5) prohibits “[t]he threat to take any action that cannot legally be taken or that is not intended to be taken.” In this case, however, PRA actually filed a state court complaint; it did not threaten to do so.
We instructed in Hartman v. Great Seneca Financial Corp., 569 F.3d 606, 611 (6th Cir.2009), that “[w]hen interpreting the FDCPA, we begin with the language of the statute itself.” (internal quotation marks omitted). Although § 1692e broadly prohibits a debt collector from using “any false, deceptive, or misleading representation or means in connection with the collection of any debt,” Stratton pleaded a violation of § 1692e(5), which specifically requires a “threat.” The majority is right that we may “proscribe other improper conduct which is not specifically addressed” under § 1692e, but Stratton has not alleged a violation of § 1692e and § 1692e(5) does not authorize the majority to ignore the specific textual requirement.
To hold that PRA threatened to take illegal action the majority must mean either (1) filing a complaint can be a “threat” within the meaning of *680 § 1692e(5), or (2) § 1692e(5) penalizes even actions that have already been taken. Neither proposition is trae.
* * *
We have never held that filing a complaint is itself a “threat” within the meaning of § 1692e(5). The source of authority for the majority’s contrary conclusion is our unpublished opinion in Gionis v. Javitch, Block, Rathbone, LLP, 238 Fed.Appx. 24 (6th Cir.2007). But in Gionis the actual “threat” to recover unauthorized attorney fees appeared in an affidavit appended to the complaint, not in the complaint itself. We said explicitly that the “unlawful ‘threat’ to collect attorney fees was made in the Affidavit,” id. at 29, which was intended to communicate directly with the debtor; the complaint was not itself the “threat.” Both Foster v. D.B.S. Collection Agency, 463 F.Supp.2d 783 (S.D.Ohio 2006), and Poirier v. Alco Collections, Inc., 107 F.3d 347 (5th Cir.1997), are similarly distinguishable.
The reason for excluding complaints from “threat” liability should be clear. If filing a court complaint is per se a “threat,” then every time a debt collector loses in court it has threatened to take action it may not legally take — it has thus violated the FDCPA. The “least sophisticated consumer” standard does not mean that every time a debt collector makes a reasonable mistake of fact or law it has thus violated federal law. To hold that Congress contemplated such a scheme defies belief.
(Emphasis sic.) Stratton, 770 F.3d at 454 (Batchelder, J., dissenting).
{¶ 177} FRIC’s request for interest at the 24 percent rate was not necessarily barred by Ohio law. Had FRIC produced the actual agreement at issue in this case and had the agreement provided that an interest rate in excess of the statutory limitation was agreed to by both of the originally contracting parties, FRIC might have been entitled to an award of interest at that rate. I cannot conclude that interest at the 24 percent rate is recoverable here, because no party in this case produced the original agreement during discovery. My conclusion, however, is quite different from a determination that FRIC was barred, as a matter of law, from seeking interest at that rate in its complaint against the decedent. FRIC’s claim for 24 percent interest fails because of an evidentiary shortcoming that was not clarified in the discovery process, not because FRIC is barred, as a matter of law, from seeking that interest.
{¶ 178} As many courts have recognized in similar situations, the fact that FRIC did not establish its entitlement to 24 percent interest at the initial pleading stage is not the same as FRIC making a false representation that it was entitled to 24 percent interest. See Matrix Acquisitions, L.L.C. v. Swope, 8th Dist. Cuyahoga No. 94943, 2011-Ohio-111, 2011 WL 208063, ¶ 18 (“Even if a 25% interest rate is ‘impermissible,’ as Swope claims, the [trial] court’s ruling does not *681 conflict with its finding that Matrix did not violate the FDCPA or the OCSPA because the court was to determine the proper interest rate at trial”). This is particularly true given that both the decedent and appellants attempted to use billing statements as evidence during the litigation, and the billing statements in the record consistently reflect that the applicable interest rate was understood to be 24.99 percent.
{¶ 179} Everything in a complaint and counterclaim filed in a court is an allegation, subject to being admitted or denied by the opposing party and then clarified through the discovery process and in subsequent litigation. See Hillin v. Beightler, 32 Ohio Law Abs. 251, 1939 WL 8086 (2d Dist., Franklin Cty., 1939). Indeed, the decedent employed this same understanding throughout her class-action counterclaims, asserting allegations based on purported facts (e.g., the decedent’s averment of how a debt buyer paid for her debt) or legal conclusions (e.g., the decedent’s assertions that FRIC and Cheek had engaged in deceptive acts and should be subject to punitive damages). Nothing more was required of the decedent and quite properly so. But equity requires that nothing more should be required of FRIC.
{¶ 180} Lastly, the majority ignores that Ohio is a notice-pleading state, State ex rel. Yeaples v. Gall, 141 Ohio St.3d 234, 2014-Ohio-4724, 23 N.E.3d 1077, ¶ 41 (O’Neill, J., dissenting), citing Cincinnati v. Beretta U.S.A. Corp., 95 Ohio St.3d, 416, 2002-Ohio-2480, 768 N.E.2d 1136, ¶ 29, and, therefore, FRIC was not required to plead operative facts beyond its general allegations and needed only to give adequate notice of its claims to allow the decedent to fairly defend against them. See Iacono v. Anderson Concrete Corp., 42 Ohio St.2d 88, 92, 326 N.E.2d 267 (1975). Moreover, FRIC was required to include that request for relief in its prayer in order to pursue the opportunity to recover interest. See, e.g., Civ.R. 8(A). FRIC properly attached to its complaint copies of the bills of. sale of the rights to the decedent’s account and a billing statement that Chase had sent to the decedent, thereby giving the decedent more definitive notice of its claim for interest and the basis of that claim. Rather than being used to abuse or harass a debtor, that information was used to clarify and contextualize the claim for interest.
{¶ 181} Having considered the complaint as a whole, I would hold that liability under the FDCPA and OCSPA does not attach when the prayer in the complaint simply sets forth the relief that the plaintiff seeks if it proves its case.
CONCLUSION
{¶ 182} Debt collection can be a hardhearted business. When debt collectors violate consumer-protection laws, they should be held accountable. However, no violations occurred in this particular case.
*682 Burke & Horrigan, James F. Burke Jr., and John J. Horrigan, for appellee.
Surdyk, Dowd & Turner Co., L.P.A., Jeffrey C. Turner, John Langenderfer, and Kevin A. Lantz, for appellants First Resolution Investment Corporation and First Resolution Management Corporation.
Law Office of Boyd W. Gentry, L.L.C., and Boyd W. Gentry, for appellants Cheek Law Offices, L.L.C., and Parri Hockenberry.
Michael DeWine, Attorney General, Michael J. Hendershot, Chief Deputy Solicitor, and Tracy M. Dickens, Teresa A. Heffernan, Jeffrey Loeser, Brittany M. Steele, and Melissa G. Wright, Assistant Attorneys General, urging affirmance for amicus curiae state of Ohio.
Burdge Law Office Co., L.P.A., and Ronald L. Burdge, urging affirmance for amicus curiae AARP.
Sessions, Fishman, Nathan & Israel, L.L.C., and Michael D. Slodov, urging reversal for amici curiae Ohio Creditors Attorneys Association and DBA International.
{¶ 183} In its efforts to solve a very large and very complex problem, the lead opinion makes analytical leaps over mountains of precedent without providing satisfying explanations: Delaware’s statute of limitations controls causes of action based on credit-card debt simply because Ohio consumers have mailed (or should have mailed) payments to Wilmington in that state; Ohio’.s borrowing statute can be retroactively applied to not only deprive plaintiffs of their causes of action but also to subject them to liability where liability was not clear before; and requests for relief made by a plaintiffs attorney in a complaint — whether for attorney fees, or interest, or punitive damages — can be used to establish liability against the attorney as well as the attorney’s client.
{¶ 184} If nothing else, it seems ironic that if the precedent established today by the court is faithfully applied in future cases, consumers and plaintiffs will lose many benefits provided to them by Ohio law through the same opinion that a majority of this court evidently believes will save them.
French, J., concurs in the foregoing opinion.

. “[A]lthough ‘de mortuis nil nisi bonum,’ be a maxim of our profession, the memory of the deceased has not been spared.” Pierson v. Post, 3 Caines 175, 180, 2 Am.Dec. 264, 1805 WL 781 (N.Y.1805) (Livingston, J., dissenting) (using a Latin phrase that has been translated as “(say) nothing but good of the dead,” Webster’s New World Dictionary 367 (3d College Ed.1988)). As the majority notes, the decedent, Sandra Taylor Jarvis, died during the pendency of this appeal. She may have been the victim of poor health, but we cannot assume that her ill health was the reason she failed to make payments on the credit-card account at issue in this case or that she was the gullible victim of debt collectors. The decedent stated in an affidavit that appears in the record of this case that she worked in a supervisory capacity in a bankruptcy trustee’s office for more than a decade and affirmatively stated that she had a considerable degree of familiarity with the law and legal processes. And although she alleged that she became disabled after suffering a serious stroke on February 5, 2010, that date was well after the cause of action accrued in this case, as well as in others in which she apparently defaulted on credit-card debt accumulated on other credit cards. *664 See, e.g., Capital One Bank v. Jarvis, Cuyahoga Falls M.C. No. 2004CVF03902 (Feb. 8, 2005) (entering judgment of $12,495.27 plus interest).

. Because substantive law is not at issue, neither Gries Sports Ents., Inc. v. Modell, 15 Ohio St.3d 284, 473 N.E.2d 807 (1984), nor 1 Restatement of the Law 2d, Conflict of Laws, Section 188 (1971), applies to the statute-of-limitations question in this case, Resner v. Owners Ins. Co., 3d Dist. Allen No. CA 2001 0091, 2002 WL 236970, *1 (Feb. 14, 2002), and the appellate court’s analysis of the issue was incorrect. Instead, 1 Restatement of the Law 2d, Conflict of Laws, Section 142(2) (1971), governs the resolution of conflicts over which state’s statute of limitations applies. Unifund OCR Partners Assignee of Palisades Collection, L.L.C. v. Childs, 2d Dist. Montgomery No. 23161, 2010-Ohio-746, 2010 WL 703274, ¶ 15; see also Lewis v. Steinreich, 73 Ohio St.3d 299, 303, 652 N.E.2d 981 (1995), citing Morgan v. Biro Mfg. Co., Inc., 15 Ohio St.3d 339, 474 N.E.2d 286, 341-342 (1984). As the Sixth Circuit has explained:
When a conflict arises between two states’ statutes of limitations, the Restatement provides: [“] action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state.[”] Restatement (Second) of Conflict of Laws § 142(2). Section 142(2) thus requires Ohio courts to apply Ohio’s statute of limitations to breach of contract actions brought in Ohio, even if the action would be time-barred in another state. See Males v. W.E. Gates & Associates, 29 Ohio Misc.2d 13, 504 N.E.2d 494, 494-95 (Ohio Com.Pl.1985) (applying Ohio’s fifteen-year statute of limitations to a breach of contact action that would have been barred by Virginia’s five-year statute); cf. Mahalsky v. Salem Tool Co., 461 F.2d 581, 586 (6th Cir.1972) (holding this rule does not deny full faith and credit); Mackey v. Judy’s Foods, Inc., 867 F.2d 325, 328-29 (6th Cir.1989) (affirming the district court’s application of a similar rule in Tennessee).
Cole v. Mileti, 133 F.3d 433, 437 (6th Cir.1998), citing Charash v. Oberlin College, 14 F.3d 291, 299 (6th Cir.1994). In so concluding, I recognize that Section 142 of the Restatement was revised in 1988, see 1 Restatement of the Law 2d, Conflict of Laws, Section 142 (1988), but the courts of our state have declined to adopt the revised version. See Dudek v. Thomas & Thomas Attorneys & Counselors at Law, L.L.C., 702 F.Supp.2d 826, 834 (N.D.Ohio 2010), fn. 8 (stating that Ohio courts have continued to apply the original version of Section 142). I agree that the 1971 version of Section 142 is applicable here.

. The concurring opinion’s analysis of the date the cause of action accrued places the accrual date after the effective date of the borrowing statute.

. If a falsehood is alleged without good cause, the court may sanction the plaintiff pursuant to the Ohio Rules of Civil Procedure. See Argentieri v. Fisher Landscapes, Inc., 15 F.Supp.2d 55, 63 (D.Mass.1998) (declining to impose sanctions under the FDCPA because they were imposed under Fed.R.Civ.P. 11). But the fact that a plaintiff “demands” a particular legal conclusion, judgment, and relief, whether in compensatory or punitive damages, interest, costs, or attorney fees, does not make the requested relief the basis for sanctions unless there is a clear showing that the attorney making the demand knew, or should have known, that the demand was not supported by the law. See Civ.R. 11.

. R.C. 1343.03(A) provides, with exceptions not relevant here, that a creditor is entitled to interest on an account in either the statutory rate as determined pursuant to R.C. 5703.47 or the interest rate set forth in a written contract entered between the parties. See, e.g., United Collections, L.L.C. v. Tucholski, 6th Dist. Lucas No. L-04-1314, 2005-Ohio-2495, 2005 WL 1201017, ¶ 4, 7. “R.C. 1343.03(A) requires a written contract, not simply an additional term added to an invoice and met without resistance by another party, to establish an interest rate greater than that set forth in R.C. 5703.47.” Minster Farmers Coop. Exchange Co., Inc. v. Meyer, 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 25. This court, Ohio’s courts of appeals, and the Sixth Circuit all hold that an invoice or billing statement is not sufficient to establish a written agreement for purposes of R.C. 1343.03(A). See Minster Farmers at ¶ 27-28, and eases cited therein.